(No. 84-CC-1580-

LARRY CARLSON & ASSOCIATES, INC., Claimant, *v.*
THE STATE OF ILLINOIS, Respondent.

*Opinion filed June 17, 1988.*

COYLE, GILMAN & STENGEL (WILLIAM R. STENGEL, JR., of counsel), for Claimant.

Neil F. Hartigan, Attorney General (G. Michael Taylor, Assistant Attorney General, of counsel), for Respondent.

Montana, C.J.

The Claimant, Larry Carlson & Associates, Inc., filed its complaint in the Court of Claims alleging a breach of contract. Specifically, Claimant alleges the State entered into a contract with Walsh Construction Company of Illinois to do bridge repairs on a bridge at the Chicago Circle Interchange in Chicago, Illinois. Claimant subcontracted with Walsh Construction to furnish all labor, material, and equipment required to do certain bridge repairs according to the specifications. The subcontract provided Claimant would be paid $170.00 per cubic foot and the rate was determined by the contract specifications which specified epoxy materials which were trowelable in layers not to exceed one inch in total depth. Claimant also alleges that upon beginning work it became apparent that the specified epoxy products were not appropriate for the job and it was necessary to change epoxy materials. The new substance required forming rather than trowel application. The cost escalated to $525.73 per installed cubic foot. Claimant asserts it completed 484 cubic feet using the substituted epoxy material for a net charge of $172,173.32. The Illinois Department of Transportation (IDOT) refused payment. Later, Claimant was directed

by IDOT to change to a non-epoxy pneumatically-applied material called Sikatop and it completed 187.1 cubic feet of this material for a net charge of $51,098.88. When Claimant sought payment, IDOT denied the claim. Claimant alleges that the substituted epoxy, Sikatop and labor were outside the contract and due to the error in contract specifications. Claimant further alleges a breach of IDOT's implied warranty that the plans and specifications furnished Claimant would enable it to do the work with the required materials. Walsh Construction Company assigned its cause of action to Claimant who now seeks a total of $223,272.20. This was in settlement of a lawsuit wherein Claimant sued Walsh.

A trial was held in this cause before Commissioner Robert Frederick. The Claimant presented evidence, but the State chose to rest without presenting any testimony. The evidence presented was the testimony of C. Stanton Fowler, Claimant's exhibits B (attached to Claimant's complaint), 1, 2, 3, 4, 5a, 5b, 6, 7, 8a, 8b, 8c, 8d, 9, 10a, 10b, 10c, 10d, 11, 12, 13, and Respondent's exhibits 1 and 2. Claimant's exhibits B, 1, 2, 3, 4, 5a, 5b, 6, 9, 11, and 12 were admitted. Exhibit 13 was refused. Exhibit 7 was taken under advisement. Exhibits 8a, 8b, 8c, 8d, 10a, 10b, 10c, and 10d were admitted for the limited purposes stated in the record. Respondent's exhibit 1, the last two pages only, and Respondent's exhibit 2 were admitted. The Commissioner requested that the entire contract be placed in evidence and both parties agreed. The issues have been fully briefed by the parties and the Commissioner has duly filed his report.

The parties stipulated that the Claimant installed 484 cubic feet of the substituted epoxy material and 187.1 of Sikatop material as pleaded in Claimant's

complaint. Foundations for admissibility of letters and literature from material suppliers were waived. The parties further stipulated that foundations for the tabulations concerning proof of damages relative to material supplied, labor costs, the raw data for the material supplied, and time records would be waived. The raw data reflected in the calculations, being Claimant's exhibits 1 and 2, are accurate tabulations of the data from the payroll expenses and labor records of Claimant. Lastly, the parties stipulated that the job specifications at issue are those reflected in Claimant's exhibit B which was attached to Claimant's complaint.

C. Stanton Fowler testified for Claimant. He was employed by Claimant in 1980 at the time of the project at issue. He had started working in the epoxy repair industry in 1976. On the job at issue, he was responsible for evaluating the job, bidding on the job, and for execution of the work.

Mr. Fowler testified that epoxy is a very strong substance that is used with aggregate to reinforce deteriorating concrete. Some epoxies are used to protect concrete from further deterioration and others try to make it compatible with the concrete. Epoxy in its gel form generates its own heat. The heat is dissipated by having it absorbed into the concrete or into aggregate which is mixed in with it.

Mr. Fowler had worked on other various projects where he used epoxy materials. He was familiar with epoxy materials in the industry and had reviewed literature and had epoxy materials demonstrated by salespeople. He was familiar with the specifications for the instant project as set forth in exhibit B. The specifications listed a Colma-Dur Gel manufactured by

the Sika Chemical Corporation and he was familiar with this material as he had seen it demonstrated and had used the product on a project. He was familiar with Ex-60 Hydro-Ester Low Modules Trowel manufactured by Fox Industries, Inc., which was also listed in the specifications. He also was familiar with the third product on the specification list, that being Duralith Gel manufactured by Dural International Corporation.

Each of the three listed products is a gel and very obviously trowelable. They are designed for an in-depth repair and can be put in at layers not to exceed one inch. The products are gummy and very sticky so they can be applied overhead. They stick and can be spread with a trowel. No forms need to be built to hold the substance.

After the Claimant became aware of this job through a job bulletin, Mr. Fowler reviewed the job specifications, and inspected the work area. He and his foreman personally inspected the bridge where the work was to be done. There were spots of rust where wire was too close to the surface of the concrete. As rust occurs, the concrete, due to weather, expands and breaks. The surfaces did look reasonably sound and smooth; however there were some chipped-out areas. In their opinion, there would be a minimal amount of concrete removal which would dovetail right into the product specifications and which would correlate to the depths for those allowable for Colma-Dur Gel or the Duralith. The Claimant had no reason to question the job specifications at the time of bidding, and it had had a similar job in Iowa on a bridge a month before where the same type of application that was intended to be used on this job was used. The three products specified could only be used within a very shallow depth and appeared to be correct for this job based on their inspection.

Claimant prepared a bid and it was based on the use of a specific family of epoxies and the labor and concrete removal required to apply it. This was a per unit contract.

After reviewing the job Claimant ordered epoxy. It was under a requirement to submit the product specifications from the manufacturer to the owner, IDOT. Claimant purchased Nilkepoxy No. 26 manufactured by Rocky Mountain Chemical Company, and this product was approved. It is the same type of epoxy as the other listed ones. Exhibit 4 is the specification sheet for Nilkepoxy No. 26. Exhibits 4, 5, and 5b are specification sheets for Nilkepoxy No. 26 and Sika Colma-Dur Gel. They appear to have very similar specifications and all fall well within the requirements of exhibit B.

Claimant gave exhibit 4, the specification sheet, to the Respondent and the product was approved for use. All the products were non-sag which means they can be troweled overhead without falling out of place. The specifications in exhibit 5a limit the thickness of the Sika Colma-Dur Gel to 50 mils when used as an adhesive. Mr. Fowler believed 50 mils to be somewhere between 1/8 inch to an inch. Based on his experience he testified that if the substance was applied in a thickness in excess of an inch it would crack and shatter due to the heat it would generate and would not adhere to the surface it was applied to. If you tried to fill a 4-inch hole with 8 half-inch applications, that also would fail as the product becomes impervious like a sheet of glass after it hardens and it would come apart. Neither Nilkepoxy 26 nor Sika Colma-Dur Gel can be used in layers beyond one inch and only then if the application is made before the material becomes impervious. Exhibit 6 is Claimant's estimate for the job based on past experience, a review

of the specifications, and an on-site inspection. Claimant figured the amount of work its work force could do using the required materials. Because the epoxy was trowelable, it could be applied at a very fast pace so the amount of men and the time involved would be low. Claimant expected to be on the job 14 weeks.

Upon commencing the job, Claimant learned that the concrete removal was a lot deeper than they expected. The State's consulting engineers were advised of the problem and they instructed Claimant to remove the concrete. In most cases it was four to five inches inside the concrete pier. The State's engineers determined how much concrete was to be removed. There was nothing in the blueprints that indicated the depth of these piers. After several weeks on the job and finding the depth of the concrete to be removed was four to five inches, Mr. Fowler had a conversation with Mr. Crossman, a representative engineer from the Department of Transportation in Schaumburg. Claimant had requested a meeting with the consulting engineers, Envirodyne, and State engineers to look at the depths of demolition as the product they had to use to repair the structures would fail. Mr. Crossman indicated to Mr. Fowler that if the depth continued they would sit down and resolve the problem. Mr. Fowler told Mr. Crossman that a different method for installing epoxy would have to be used. Forms would have to be built and labor and material costs would be far greater than expected. He stated that the specified product would fall out as soon as it got cold in the winter.

Mr. Crossman instructed Claimant to submit in conjunction with the consulting engineers another product for approval. They submitted another product for approval, Nilkepoxy No. 4, which was approved.

This product must be formed because it has an oatmeal-type consistency.

The Claimant incurred substantial extra expense for labor and equipment to build the forms and do the work using Nilkepoxy No. 4. Four laborers were generally needed for this form method where only one would be used for the trowel method. The cost per cubic foot of material installed increased tremendously.

The parties stipulated, however, that Claimant did request a change order for the scope of the work and the change order was not approved by IDOT.

Claimant, in April of 1982, sent purchase orders to the manufacturers of the originally specified products, Sika Colma-Dur Gel, Ex-60 Hydro-Ester Low Modules Trowel, Duralith Gel and Nilkepoxy No. 26 requesting certification for use of their products for the purposes of the State on this project. See exhibits 8a, 8b, 8c, and 8d. They all categorically refused to so certify the product. This was done by Claimant because at a meeting with IDOT in April of 1982, IDOT requested proof that the products specified in the contract would not work. Exhibits 10a, 10b, 10c, and 10d are the companies' refusals to certify the products.

Claimant proceeded to use the substituted Nilke-poxy No. 4 for 484 cubic feet. The contract price was $522.73 per cubic foot. The cost of installation over the original contract price was $172,173.00.

Another meeting was held and the engineers and IDOT approved the use of a material called Sikatop. They applied 187 cubic feet. A large compressor and more labor was required to apply Sikatop. The cost to apply per cubic foot was $273.11. The increased cost over the original contract was therefore $51,088.91. The

State told Claimant to use the Sikatop on the remaining cubic feet. The total cubic feet was 660. They used Nilkepoxy No. 4 on 480 cubic feet and Sikatop on 180 cubic feet. Sikatop was cheaper than the forming method. It was applied with a pneumatic gunnite machine. Sikatop is not an epoxy material so in effect the State removed their requirement of an epoxy material. The job went from April of 1981 to December of 1982 rather than the 14 weeks originally scheduled due to the changes in the materials and the scope of the job. On cross-examination, Mr. Fowler indicated that he inspected the site prior to bidding by looking at the underside of the overpasses and piers, touched them, and tried to sound them with a rock on the ones that could be reached. He indicated there was a problem in that you could not tell how deep the patches would be because the surface was flush and there was no way of telling unless it was completely removed. He testified that while you could not tell how much concrete would have to be removed by looking at the bridge, the specifications for the materials told him the maximum depth.

The issue before the Court is whether the bid of Claimant was just a bad bid or whether Claimant was a victim of a material misrepresentation in the plans and specifications prepared by the State.

Exhibit B states the applicable job specifications. "This work shall consist of the furnishing of all material, labor, and equipment to remove and dispose deteriorated concrete, replacing it with an epoxy mortar and all other incidental and collateral work at those locations shown on the plans and as directed by the engineer." Preparation of the areas to secure the epoxy mortar was also included in the work. All loose concrete was to be removed and then cleaned. The sound concrete was to

be scrubbed with epoxy binder (without aggregate) just prior to the placement of the epoxy mortar. "The epoxy mortar shall be suitable for placement in vertical and overhead positions. It shall be capable of bonding to damp concrete surfaces * * *" Epoxy mortars designated as meeting these requirements and acceptable are Colma-Dur Gel by Sika Chemical Corporation, Ex-60 Hydro-Ester Low Modules Trowel by Fox Industries or Duralith Gel by Dural International Corp. Other products meeting the requirements could be approved. The work was to be paid for at the contract unit price per cubic foot for epoxy mortar repair.

The manufacturers' specifications sheets for Nilkepoxy No. 26, Colma-Dur Gel and for Duralith Gel do not limit the product to one-inch patches or less. However, the witness presented by Claimant testified to his experiences with these epoxies and testified that they could not be used for the repairs herein once the depth of the repair was determined to be four to five inches. The State chose to present no expert witnesses. The facts indicated that the original trowel-type epoxy could not do this job and mortar installed by use of forms was required. The Court must decide if this change constituted such an increase in the quantity of the work to be performed of such magnitude as to constitute a substantial or material variation in the original contract. To determine this question requires a determination of what the original contract was. Claimant has proved by a preponderance of the evidence that the original contract was a contract to repair the bridge using a trowel-type method. The State's engineer's admissions and the change in product indicate the substantial and material change in the original contract.

The specifications of the three trowel-type epoxies indicated to Claimant that the work was such that the

trowel method was to be used. Claimant's bid was based on the trowel method. It was only when actual work began that it was discovered that the trowel method could not be used. There was therefore a patent ambiguity in the specifications. This Court has granted an award to a contractor for damages caused by mistake or ambiguity in the State architect's plans. (*Galesburg Construction Co. v. State* (1978), 32 Ill. Ct. Cl. 500). The State argues Claimant should have known the scope of the work, yet the State presented no evidence to indicate that the visual examination of the bridge was negligent or that in the industry it is customary to do a greater inspection. This is important in that the State set the specifications for the epoxies to be used and such specifications in exhibit B were more than mere suggestions as the State argues. The State needed to prove by expert testimony that the specifications clearly showed this work was included in the original bid. It chose not to.

The Respondent objected to admitting Claimant's exhibit 7, an internal memorandum of IDOT. It is the Court's determination that exhibit 7 should be admitted into evidence. The trial in this cause was a search for the truth. The Respondent has admitted the genuineness of exhibit 7. This exhibit is an admission and thus corroborates the Claimant's position that the specifications were contradictory. The exhibit also indicates that in vertical and overhead repairs, form work is required.

The Commissioner requested the whole contract be placed in evidence. Both parties agreed to do this. The contract is informative in deciding the case. In temporary bridge deck repairs (contract pages 72 M, N, O), a distinction is made in the removal of concrete of less than 3½ inches depth and more than 3½ inches depth.

In deck slab repairs in the U.S. Post Office on page 72T of the contract, epoxy mortar repair is limited in No. 2 to where the depth of the unsound concrete in the bottom of the slab (the top of the slab being sound) does not exceed 3½ inches. The unsound concrete removed by Claimant was four to five inches. It is clear that while no one knew the actual depth of the unsound concrete prior to commencing work, the actual depth required to be removed and the change in material and application constituted a material misrepresentation in the plans.

It is Respondent's position that the original specifications of materials with their accompanying specification sheets were sufficiently clear and the contractor should be bound by its original bid. The evidence is anything but clear to the Court. Respondent should have presented evidence, if it had evidence, to show the specifications were clear. It did not. The Claimant presented evidence to show the specifications were anything but clear. The State's own contract showed a 3½ inch limit in epoxy mortar repairs in another section of the contract. The Court believes the Claimant has proven a material misrepresentation which led to extra work.

We find that the Claimant did not simply make a bad bid in this case. The Respondent impliedly warranted that the work on this project could be performed according to the plans and specifications, that the specifications were adequate for performance of the job, and were free of material defects. The only evidence before this Court is that the specified materials were not adequate for the project. The actions of the Respondent in evidence are admissions that the materials were inadequate. The Respondent directed the Claimant to use the other materials which could not

be applied in the same manner as those originally specified.

Claimant has shown damages of $172,173.32 on one portion of the project and $51,098.88 on another. It is hereby ordered that the Claimant is awarded the sum of $223,272.20 in full and final satisfaction of this claim.