(No. 89-CC-2162-)

ALBERT S. DAVINROY, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed October 28, 1991.*

ROBERT RICE, for Claimant.

269

ROLAND W. BURRIS, Attorney General (MARY ELISE WALDEN, Assistant Attorney General, of counsel), for Respondent.

OPINION

RAUCCI, J.

Claimant alleged that he entered into a contract with the State of Illinois Department of Transportation (Department) to be the general contractor to complete a project at the Bowman Avenue pump station in East St. Louis, Illinois. He further alleged that the contract provided for liquidated damages in the event of delays

caused by the Claimant. The project was delayed 138 working days and the Department withheld liquidated damages from the Claimant. The Claimant alleged that he did not cause the delays. Claimant seeks $38,640.00 which he claims the Department improperly withheld pursuant to the contract.

The purported brief of Claimant is of little help to the Court in resolving the issues in the case. The Department's failure to file a brief in support of its position is also not conducive to the resolution of the case. However, the Court will proceed to a decision in this case without the benefit of substantial input from the parties.

## The Facts

The Claimant was awarded a contract with the State of Illinois on May 15, 1980, to modify the Bowman Avenue pumping station in East St. Louis, Illinois. The work on the contract began on July 10, 1980. Claimant was the general contractor on the project. The project called for replacing and installing larger pumps in the station and to install a generator that would automatically start when power failed at the station. The pumping station kept highways, Routes 70 and 40, clear of water that would come onto a depression in the land.

Because the possibility existed that a vehicle with flammable liquids could overturn on the depressed area and flammables could enter the pumping station, a foam system with a sensor had to be installed. The original pumping station did not have this protection.

The project began in 1980 and ended in 1986. The total contract price was $1,680,214.00. A change order increased the total amount by $92,675.00. The Claimant's

company was involved in a portion of the work. Subcontractors were also used and Dron Electric had a contract for about 50% of the work.

When Claimant received final payment, the Illinois Department of Transportation assessed a penalty against Claimant. The penalty was for 138 working days and appears as liquidated damages in the Department's authorization of contract charges. The penalty totaled $38,640.00. The penalty was for liquidated damages as defined in article 108.10 of the standard specifications. There were 160 working days assigned to the project. The project took 298 working days. Claimant's Exhibit No. 1 indicates that Claimant concurred in the processing of the deduction. Claimant believed this agreement to concur still allowed Claimant to sue in the Court of Claims to recover the monies withheld.

Claimant testified the 138 days of delay were not within his control. Claimant asserts that section 108.04, section 5 does not allow working days to be charged against Claimant's firm for conditions such as strikes, acts of God, problems with supplies, subcontractors, and other things out of his company's control. Claimant believed the cause of the delays was attributable to Dron Electric and not Claimant. Claimant had problems with Dron Electric who was the supplier of the foam system. They also had problems with the sheet metal company that had the ventilating system contract. Claimant testified he brought the problems with Dron Electric to the Department's attention. At some point, he also discussed bringing in a different electrical contractor to take over for Dron. Dron responded by indicating if anyone worked on their equipment, all warranties and guarantees would be revoked. They also threatened that if anyone took over Dron's work, that this would

constitute acceptance of Dron's work. Dron Electric provided Claimant with a letter dated July 26, 1984, indicating a response to IDOT's questions on the project. The response indicates some problems were Claimant's responsibility and others were Dron's responsibility.

Claimant admitted that as general contractor he was responsible for the work of the subcontractors. Claimant also admitted the contract ran over about four years from the time it was to be completed. The Department of Transportation had early in the contract advised the Claimant that Claimant was not providing progress schedules as required in a timely fashion. The Department sent numerous letters to Claimant which showed the Department's concern at the rate of the completion of the contract. The Department also sent Claimant correspondence indicating they had not received specifications for approval of equipment from Claimant as required.

Claimant testified that his work and responsibilities as contractor on this job did not depend upon Dron Electric completing work. It was an unusual contract in that the electrical part of the contract was 50%. The electrical end of the contract called for a longer completion time than Claimant's own work did.

Claimant had 160 working days to complete his work. However, the Department cut off working from the first freeze until April or May. Claimant also testified he warned the Department at the pre-construction meeting that the supplier of the pumps could not manufacture the pumps in time.

While the contract ran over four years, Claimant was only penalized 138 working days. He believed that 98% of the 138 days was the fault of the suppliers and

subcontractors. Dron Electric was accountable for 90% of the delay in Claimant's opinion. Fairbanks-Morris Company, the supplier of the pumps, had some blame for the delay as a pump they provided failed and had to be taken out. Claimant believed that the sheet metal provider was two to three percent responsible for the delay. Claimant admitted that he was responsible for two to three percent of the delay.

The Respondent rested on the departmental report. The departmental report indicates that a pre-construction conference was held on June 11, 1980. The Claimant was advised that he should specifically state what documentation was required from the manufacturer when ordering materials and he was informed that materials such as pumps must be approved by the district engineer prior to use on the project. On July 18, 1980, the Claimant was advised by the Department of the importance of a progress schedule and of equipment submittals. On July 31, 1980, the Claimant was again advised of the importance of a progress schedule and he was advised that the Department's contract was solely with Claimant, and that Claimant was responsible for the work under the contract, the scheduling of subcontractors, and the obtaining of proper documentation.

The progress schedules submitted by Claimant were late and did not contain the proper detail and documentation. These inadequacies contributed to the delay on the project. The Department sent numerous letters to Claimant expressing concern for the completion of the project within the days assigned thereto. The Department also had numerous meetings with Claimant in this regard. On January 21, 1983, the Department requested Claimant to state his position on the delays and the Department's assessment of working days in

writing. The Claimant made no response. The Department continued assessing working days to the project. However, the Department's letter of March 9, 1983, indicates the following, in respect to Claimant's performance of the contract,

"The primary reason for this poor progress is the contractor's inability to cause his subcontractors and suppliers to prepare and submit shop drawings, catalog cuts, wiring diagrams and erection plans. This failure to provide acceptable and timely submittals has resulted in unacceptable order and delivery dates of equipment."

A final inspection was performed in June of 1984 and a punch list provided the Claimant. The Claimant was given until September 4, 1984, to resolve the differences before working days would be charged on the project. The inspection of August 12, 1986, showed that the project was finally completed.

The departmental report points out that section 109.09 of the standard specifications provides that the contractor must file a claim in the Court of Claims within 60 days after acceptance of the final payment or that acceptance will constitute a release and waiver of all rights under the terms of the contract. The final payment was accepted by Claimant on December 2, 1987.

The contract incorporated the provisions of the standards and specifications for road and bridge construction adopted October 1, 1979. The contract required Claimant's work to be completed within 160 days. A pre-construction conference was held on June 11, 1980. The contractor indicated all the electrical work would be subcontracted. The contractor was informed of the proper forms for subcontractors and of approval which must be received as to subcontractors. The contractor was also advised of approvals required as to materials. The contractor indicated the generator required normally takes 13 months to manufacture but

that one in the process of being manufactured had been found and it could be available on August 31, 1980. The contractor was reminded that when ordering materials for this job, he should clearly state the specifications the materials must adhere to, what documentation and certification was required from the manufacturer, and that all materials are subject to State of Illinois inspection with sampling to be performed at the source when required and when a State inspector is available for performing the inspection.

On July 18, 1980, the Department returned the Claimant's progress report for corrections. The July 1980 portion of that progress report was approved. The request for approval of subcontractor Dron was returned for revision. The subcontract to Dron was for 45% of the work. The contract only allowed a total of 49% of the contract to be sublet and Dron alone was to receive 45%. The $56,631.00 of general electrical work was approved by the Department to allow Dron to perform initial items pending resubmittal of the proposed contract.

The Department warned Claimant on July 21, 1980, that the completion of many contract items within the time limits specified under the contract was significantly dependent upon timely equipment submittals by Claimant. The Department advised Claimant that working day charges may not be suspended while waiting for the delivery of equipment that was not timely submitted and ordered.

On August 20, 1980, Claimant requested that the 50% limitation on subcontracting not be applied because of the unique electrical nature of the contract. This request was denied and Claimant was advised that the project was subject to all of the standard specifications for roads

and bridges. The Claimant was hesitant to file his progress schedule but the Department requested the progress schedule and advised Claimant of the importance of the schedule. Claimant was advised he must challenge any disagreements on working days charged within seven days to initiate a review. Claimant was advised again that the only contract the Department recognized was with Albert Davinroy Construction Company and that Claimant was solely responsible for the work under the contract. The Claimant was advised he must fully comply with all terms of the contract before final acceptance.

Claimant filed a progress schedule which was approved through June of 1981. A revised progress schedule from Claimant was required by June 1, 1981. On August 6, 1981, a revised progress schedule was submitted by the Department. On November 24, 1981, the Department wrote its fifth letter to Claimant in regard to the main storm water pumps. The Department would not approve the pumps because of a failure of the pumps to meet contract requirements. The Claimant had failed to reply to the Department's four prior letters.

The Department warned Claimant by letter on December 29, 1981, that approximately 45% of the contract had been completed and 82 of the 160 working days had been used up. The Department further warned Claimant that he may not be able to complete the contract within the contract time limit and asked Claimant to give these considerations immediate attention. However, the December 23, 1981, weekly report of the resident engineer indicated the project could still be completed on time.

The Department wrote again to Claimant on June 28, 1982. Claimant was advised that as of June 23, 1982,

only 50% of the contract work had been completed but that Claimant had used 105½ days of the 160 working days allowed for the project. The Claimant was advised that experience had shown that final items on similar contracts could take more time than expected. The Department requested an increased effort by Claimant to get the project back on schedule. The Department was only charging half working days because the failure of Pump No. 1 was impeding the potential rate of work on new pump installations. An agreement was reached with Claimant to repair Pump No. 1 at an agreed price of $15,500.00. The Department further warned Claimant that as of July 30, 1982, the Department would again be charging full working days against the Claimant as the pump should be repaired by then.

The Department reminded Claimant that after 26 months into the contract the Department had not yet received an acceptable submittal for the fire control system. Claimant was told that any delays caused by nonapproval or delivery of this system would not be grounds for an extension of time under the contract.

The Department specifically advised Claimant that there was a significant potential for a project overrun leading to liquidated damages. Claimant was advised to give this matter serious attention.

Claimant, on July 16, 1982, questioned the Department's charging full working days beginning July 30, 1982. He objected and advised the July 30, 1982, date did not provide sufficient time to complete repairs on the pump. Claimant was advised to request an extension in writing. Claimant was advised again that the fire protection system still had not been approved.

A job site progress meeting was held on September 3, 1982. The Claimant was optimistic that the progress

would improve and the project would be completed in the fall of 1982. The Claimant indicated he expected to purchase equipment and install it without approval. The Department advised Claimant this procedure was Claimant's risk.

On August 25, 1982, Claimant was advised that 126.5 of the 160 working days had been used. The Department expected the total working days to be expended by October 6, 1982. Any awarded work after that date would incur a charge of $280.00 per working day for liquidated damages. On September 9, 1982, the Claimant concurred in general with the August 25, 1982, letter from the Department as to working days used and liquidated damages.

On October 6, 1982, Claimant was advised that 154 of the 160 working days had been used but only 63% of the project had been completed. The Claimant had done no visible activity in the areas pointed out to Claimant requiring work in the Department's letter to Claimant of September 29, 1982. The Department advised Claimant that the progress on the project was totally unacceptable. Claimant was advised that article 108.11 of the standard specifications defined Claimant's lack of progress as grounds for default. The Department began considering initiation of the default mechanism.

On November 1, 1982, Claimant was advised that liquidated damages were accruing and that the Department was still seriously considering its position on a default. The Claimant still had not submitted shop drawings for the fire control system as of November 1, 1982.

On November 16, 1982, a meeting was held. The Claimant advised that he would submit the required progress schedule by November 24, 1982. The schedule

had been due November 12, 1982. By December 14, 1982, the Department still had not received a revised progress schedule from Claimant. The sump pump prices and fire control system drawings, overdue on November 12, 1982, also had not been submitted.

At a jobsite meeting on November 29, 1982, Claimant indicated he felt the working days being charged were too harsh. The Department countered that the resident engineer had been particularly tolerant with Claimant. As of December 6, 1982, only 193 working days were charged when the Department could have charged him 224.5 working days. The Department requested any challenge to the working days charged should be made in writing by Claimant and supported by specific reasons.

On December 14, 1982, Claimant was advised of the serious situation where liquidated damages were being charged against the delivery of equipment that had never been properly submitted for approval. Claimant raised objection on December 23, 1982, to working days being charged relating to the sump pump problem. On January 21, 1983, the Department advised Claimant that no working day charges were being made in regard to the sump pump installation or fire control system. Claimant was advised that because Claimant had failed to provide a valid progress schedule, that, therefore, the resident engineer had defined the main storm water pumps as the controlling item and all recent working days were charged against that work alone. As of March 9, 1983, Claimant had been charged with 198 working days and the project was only 78% complete.

The Department found the primary cause of the poor progress to be the contractor's inability to cause his subcontractors and suppliers to prepare and submit shop

drawings, catalog cuts, wiring diagrams and erection plans. The fire protection system submittal was not submitted by Claimant until September of 1982, some 16 months after the contract award. The submittal was incomplete and not acceptable. As of March 1983, an acceptable submittal had not been made by Claimant.

As of April 5, 1983, Claimant had filed no written objections to the resident engineer's selection of controlling items under the contract in the absence of a valid progress schedule and therefore the charging of working days against Claimant.

On April 20, 1983, the Department rejected the submittals by Claimant for the fire protection system as inadequate pursuant to article 108.04. The Department advised Claimant that working day charges would be reinstituted as of May 1, 1983.

Another meeting was held on November 3, 1983. By this time, Claimant had had his prequalification to bid rating on other projects removed by the Department. Claimant requested reinstatement. Claimant advised he expected to complete this project within 90 days. Claimant was advised that liquidated damages had to be resolved before final payment. Claimant was informed that any challenge to working day charges must be presented in writing.

A final inspection of this project was completed on June 7, 1984. By letter of July 18, 1984, 64 items of deficiency requiring correction were noted to Claimant. Additionally three systems required complete field testing and three areas of minor work were required before final acceptance. The Department allowed until September 4, 1984, for Claimant to make the corrections, allow for testing, and to allow Claimant to make

the minor repairs before working days would be charged.

On August 26, 1986, almost two years later, an inspection indicated the areas of deficiency were basically corrected. On August 26, 1986, Claimant was advised to submit a request to reduce working days charged and supportive documentation required. The Department had been asking for such request and documentation since November 3, 1983. Claimant had not submitted any written request or documentation. The Department advised Claimant that the Department would initiate deduction of the amount assessed for liquidated damages from the contract value if supportive documentation was not submitted by Claimant to the Department of Transportation by September 15, 1986.

On September 22, 1986, the Department issued a fact sheet. The working day overrun was assessed at 138 days for liquidated damages of $38,640.00. On December 18, 1986, liquidated damages of $38,640.00 were assessed as a contract charge. There were 160 working days awarded and the final total was 298. The authorization for contract charge indicated that Claimant's concurrence was obtained to process the deduction.

Final payment of the contract could not be made under the contract because of the financial condition of the Claimant. Certain subcontractors would not sign releases and Dron sued Claimant. The Department retained enough monies to pay these subcontractors. Dron had a court order for payment of $70,308.18 from Claimant.

The departmental report indicates several letters to Mr. Davinroy's attorneys concerning setting up a

meeting to discuss liquidated damages and to file a written request to reduce working days. A meeting was scheduled for July 12, 1984. Claimant failed to appear at the meeting. On October 8, 1986, Claimant's attorney sent a letter to the Department regarding Claimant's position. The Department, by letter of November 3, 1986, indicated to Claimant that detailed documentation was required to support Claimant's position that all reasonable and proper actions were made by the contractor to acquire the critical items and to show that the delays were not any fault of the contractor.

## The Law

Where the evidence presented to the Court shows more probably than not that the Respondent should have granted reasonable extension of time for delays due to unforeseen causes beyond Claimant's control and without the Claimant's fault or negligence, then and in that event Claimant would be entitled to all retainage held by the Department as liquidated damages. (*Fruin-Colnon Contracting Co. v. State* (1967), 26 Ill. Ct. Cl. 138.) The Department should allow an extension where the cause of the delay is not the fault of the Claimant. (*McHugh Construction Co. v. State* (1971), 27 Ill. Ct. Cl. 232.) In an action involving a construction contract, it is inevitable there will be some delays and a delay will be tolerated if it is reasonable. *J.F. Inc. v. State* (1988), 47 Ill. Ct. Cl. 5.

In considering the liquidated damage clause of the contract, the contract should be construed least favorably to the drafter. (*McDonnell-Douglas Automation Co. v. State* (1983), 36 Ill. Ct. Cl. 47.) However, it is Claimant's burden to prove the contract, the breach of

contract, and his damages, if any. (*In re Application of Lopez* (1987), 39 Ill. Ct. Cl. 315; *Harris v. State* (1989), 41 Ill. Ct. Cl. 184.) Pursuant to section 790.140 of the Court of Claims Regulations, departmental reports may be offered as *prima facie* evidence of the facts they contain. *Menard County Health Department v. State* (1989), 41 Ill. Ct. Cl. 200.

In the present case, the contract contained a liquidated damages clause. The Department withheld $38,640.00 from Claimant as liquidated damages for failure to complete the project within 160 working days. The departmental report indicates Claimant was assessed 298 working days to complete the project. The departmental report is replete with notice to Claimant of the working days assessed along the way, numerous warnings to Claimant of his impending failure to complete the project on time, and warnings that liquidated damages would accrue and were continuing to accrue. The departmental report indicates numerous failures of Claimant to submit progress schedules, show drawings and other required documentation. The Department gave numerous extensions to Claimant and appeared liberal in not assessing working days and in granting extensions to complete work. The Department also consistently and often requested Claimant to provide documentation if he had any complaints or objections concerning the working days assessed. Claimant was requested over and over to make a written request with supporting documentation. No such written request with documentation was ever presented to the Department of Transportation. A meeting was set up to discuss these matters. Claimant failed to appear and even after the Department agreed to reschedule the meeting, he never arranged a new meeting.

Claimant suggests the delays were that he had problems with Dron and with the sheet metal company. Here the contract ran over four years. This is beyond a reasonable delay. Claimant has failed to meet his burden of proof. Claimant's broad assertions that others were responsible without proof do not show that the delays assessed were beyond the control of Claimant. The Court requires no less documentation than the Department of Transportation was requesting of Claimant.

It is also noteworthy that Dron had a judgment against Claimant. If Dron were in breach of the subcontract, it seems unlikely Dron would have prevailed against Claimant. What is required in this Court is that Claimant show that specific working dates charged to Claimant should not have reasonably been charged to Claimant and the specific reasons they should not have been so charged.

Based on the Claimant's failure to meet his burden of proof, it is therefore ordered, adjudged and decreed that this claim be denied.