(No. 91-CC-3181-

GENIE CONSTRUCTION CO., INC., Claimant, *v.*
THE STATE OF ILLINOIS, Respondent.

*Opinion filed May 12, 1999.*

SORLING, NORTHRUP, HANNA, CULLEN & COCHRAN (MICHAEL A. MYERS, of counsel), for Claimant.

JIM RYAN, Attorney General (BRIAN J. DEES, Assistant Attorney General, of counsel), for Respondent.

## OPINION

Raucci, C.J.

The Claimant, Genie Construction Co., Inc., brings this action for compensatory damages pursuant to the Illinois Court of Claims Regulations. (705 ILCS 505/8(b).) The Claimant asserts that it suffered damages as a direct and proximate result of a breach of contract committed by the Respondent, the State of Illinois. The Claimant is seeking a refund for liquidated damages charged for beginning work on a bridge cleaning and painting contract late, and is seeking additional compensation for alleged extra work.

The following facts are basically uncontroverted. The Claimant was the successful bidder on two contracts with

the Illinois Department of Transportation, hereinafter referred to as "IDOT," entered into on June 29, 1988. One contract was for cleaning and painting bridges in District 5, which included Champaign county, and the other contract was for cleaning and painting bridges in District 3, which included LaSalle and Bureau counties. At a preconstruction conference on July 7, 1988, at which representatives of the Claimant and the Respondent were present, it was agreed that work on the District 5 bridges was to begin on July 11, 1988. At a similar preconstruction conference, on July 13, 1988, it was agreed that work would begin on the District 3 bridges on August 15, 1988. The Claimant was only able to work on one contract at a time.

Both contracts required that paint removal be done by what is known as Method II. Witnesses disagreed on exactly what was involved in a Method II removal, apparently because the requirements for this method were changed just prior to bidding on these two projects. The differences in the views on what is required for Method II removal will be addressed later.

During the course of work on the District 5 bridges, representatives of IDOT determined that the paint left after the initial cleaning was not adhering to the surface and had to be removed completely. The Claimant was given additional compensation beyond the contract price for this extra work. Because of this additional work, the Claimant was unable to begin work on the District 3 bridges until nearly one month after the scheduled start-up date. The Claimant was charged $4,687.50 in liquidated damages for this delay. The Claimant contends that a similar problem with paint not adhering occurred on the District 3 bridges, and that the Claimant was told to remove all of the paint. The Claimant is seeking additional compensation for this alleged extra work. The Respondent contends that this

was work included in the original contract and did not qualify as extra work that would merit additional compensation. Testimony surrounding these differing contentions will be addressed below.

A hearing was held before Commissioner Stephen R. Clark, at which there was testimony from Michael Ray Wilson, part owner of the Claimant company; Bill Taylor, an employee of the Claimant; George Davis, who was the resident engineer for IDOT in District 5; Richard Wayne Hahn, who was project review engineer for IDOT's Bureau of Construction; Tom Jensen, bridge painting inspector for District 3; and Bill Flannigan, who was IDOT's bridge maintenance engineer. The Commissioner also admitted into evidence five photographs of bridges, a copy of the pre-construction conference memorandum for District 3, a copy of the authorization of contract changes for District 5, department specifications for bridge cleaning and painting, a summary of the alleged extra costs incurred by the Claimant in the District 3 work, correspondence between the Claimant and the Respondent regarding this claim, and IDOT's departmental report. We give little weight to the narrative at the beginning of the departmental report, because it is self-serving and conclusory.

The two main issues to be resolved are whether the late start on the District 5 project was chargeable to the Claimant or the Respondent, and whether there was extra work performed that was not contemplated by the original contract for the District 5 bridges. The facts being disputed regarding this second issue are whether the work ultimately performed by the Claimant was within the requirements of a Method II removal, and whether testing performed by the Respondent's employee on the District 5 bridges complied with IDOT's regulations.

The first issue can be readily disposed of because the facts are basically uncontroverted. We have held that where the evidence presented shows, more probably than not, that the Respondent should have granted reasonable extension of time for delays due to unforeseen causes beyond the Claimant's control and without the Claimant's fault or negligence, then the Claimant would be entitled to all retainage held by the Respondent as liquidated damages. (*Davinroy v. State* (1991), 44 Ill. Ct. Cl. 268, 282.) The Respondent should allow an extension where the cause of the delay is not the fault of the Claimant. *Id.*

In the instant case, it is clear that the delay in beginning the District 3 project was not the fault of the Claimant. The Respondent was aware that the Claimant was to work one project at a time. Before the start-up date on the District 3 project, the Respondent was aware that extra work was being required of the Claimant on the District 5 project and would cause a delay in beginning the District 3 project. There is no excuse that, because these two projects were in two different districts, the Respondent's right hand (District 3) would not know what the left hand (District 5) was doing. Therefore, we find that the delay was chargeable to the Respondent and was not the fault of the Claimant, and therefore, award the Claimant $4,687.50.

The second issue–whether the work performed in District 3 was outside the scope of the original contract and should be considered extra work for which additional compensation should be awarded—is a much more difficult issue. Not only are the facts surrounding this issue controverted by the parties, but they also apparently are controverted by employees of IDOT itself. At issue here is the interpretation of a Method II paint removal. To determine what is required by this method, we must consider

not only the specifications and the interpretations by the parties, but also the course of dealing that occurred during the performance of the District 5 contract. The special provisions included in the bidding materials upon which the Claimant based its bid for the District 3 project state the following:

"CLEANING AND PAINTING STEEL BRIDGES: Existing paint shall be removed using Method II cleaning. The three coat lead and chromate free alkyd paint system shall be used for field painting of existing structural steel * * *.

509.06(a)(6) Surface Preparation Visual Standards. Surface preparation approval shall require the preparation of test sections. The Contractor shall prepare the test section surface to the specified level in accordance with the Swedish IVA Corrosion Committee visual standards supplied by the Engineer. These visual standards shall be used to determine the degree of conformance with the appearance requirements of the prepared surface. Prior to production surface preparation the Contractor shall prepare a test section on each structure to be painted in a location which the Engineer considers to be representative of the existing surface condition and steel type for the structure as a whole. The test section shall be prepared using the same equipment, materials, and procedures as the production surface preparation. The test section shall be in the range of nine (9) to twelve (12) square feet. Only after a test section area has been approved may the Contractor proceed with surface preparation operations. The visual standards shall be used in addition to the plans and specifications to determine acceptance of surface preparation. No additional compensation will be allowed the Contractor for preparation of test sections.

509.06(b) Cleaning and Surface Preparation * * *

Method I (Complete Paint Removal). The surface preparation shall remove all rust, mill scale, foreign materials, and old paint down to bare metal. Unless otherwise specified, the surface preparation shall be accomplished in accordance with the requirements of the SSPC Surface Preparation Specifications SP6, for Commercial Blast Cleaning, except the visual standard shall be as herein specified. The surface preparation shall result in a 1-3 mil blast profile as determined by the Engineer. If rust or corrosion products have formed between connected plates or shapes of structural steel, the gap between the connected parts shall be cleaned by air blasting, hand tools or power hand tools approved by the Engineer * * *.

Method II (Partial Paint Removal). The surface preparation shall remove all rust, loose mill scale and loose, checked, alligatored and peeling paint. The surface preparation shall be accomplished in accordance with the requirements of the SSPC Surface Preparation Specifications SP7 for Brush-Off Blast Cleaning, except the visual standard shall be as herein specified. In addition, visible areas of rust which remain after the brush-off blast cleaning shall be prepared to bare metal in accordance with Method I above. An area

of a minimum of one and one half (1-1/2) inches between the brush off area and the complete removal area shall be feathered using a dual action sander to provide a smooth transition between the new and old coatings.

Method III (Spot Paint Removal). The surface preparation shall remove all loose rust, loose mill scale, and loose, checked, alligatored and peeling paint from those areas designated by the Engineer. It is not intended that adherent mill scale, rust, and paint be removed by this process. Mill scale, rust and paint are considered adherent if they cannot be removed by lifting with a dull putty knife. Surface preparation shall be accomplished by the use of hand held metal brushes and scrapers, or other effective means meeting the approval of the Engineer. Abrasive air blasting or power tools may be used with the written permission of the Engineer provided results are equal to the best results obtainable by hand methods.

509.06(c)(1) Complete Repainting. When the old paint is to be completely removed from an existing structure using Method I cleaning, the structural steel shall be completely repainted * * *.

509.06(c)(2) Painting with Partial Paint Removal. When the surface is prepared for an existing structure using Method II or Method III, the structural steel shall be repainted in accordance with the requirements hereinafter specified for "Lead and Chromate Free Alkyd Paint System.

> (a) Number of Coats and Minimum Thickness. Spot painting shall consist of the application of one coat of the specified primer on all areas where the old paint has been removed, feathered and/or damaged prior to, during or after the cleaning and surface preparation operations. On surfaces where small areas of steel at closely spaced intervals are exposed, the spot prime painting shall consist of a complete coating of the surface. Spot painting shall include a coat of the specified intermediate coat over all areas coated with the specified prime paint and over any badly stained or discolored areas of the old paint prior to the application of the complete coat of finish paint.

It is understood and agreed that the cost of all work or arrangements outlined above, unless otherwise specified, has been included in the bid, and no extra compensation will be allowed."

## The memorandum of the preconstruction conference on July 13, 1988, for the District 3 project stated:

"7. All bridges shall be cleaned by Method II, with the exception that the outside built up plate girders on bridge No. 10 shall be cleaned by Method I. A test patch shall be coordinated with the engineer prior to full scale cleaning. Compressors shall be oil and water free.

8. Method I requires the existing paint to be removed to bare metal. Method II requires the removal of all rust, loose mill scale and loose, checked, allegated (sic) and peeling paint. An abrasive brush-off blast is required over the entire beam. Any ridges remaining after rust is removed to bare metal shall be feathered out by a dual action sander."

160

The special provisions included in the bidding materials upon which the Claimant based its bid for the District 5 project state the following:

"*Cleaning*: Unless specified differently in the individual bridge location and work to be performed descriptions, all cleaning shall be in accordance with method II as outlined in the attached special provision for Cleaning and Painting Steel Structures. Some areas on the structural steel involved in this project may be further deteriorated than is readily apparent and prospective bidders are invited to make close inspection so they may anticipate the effort required to prepare the steel for painting.

*Painting*: The painting shall be in accordance with the attached special provision for Cleaning and Painting Steel Structures * * *."

The special provision for cleaning and painting steel structures, which includes the provision labeled 509.06, is identical in the bidding materials on the District 5 project, as it was for the District 3 project, as outlined above. The identical sections outlined above are surface preparation visual standards, cleaning and surface preparation, and painting with partial paint removal. The section on complete repainting that was included in the District 3 materials was not included in the District 5 materials.

The Steel Structures Painting Council surface preparation specification SP7 for brush-off blast cleaning, which was required in the special provisions for Method II in both the District 5 and District 3 projects, states:

"2. Definition
2.1 Brush-off blast cleaning is a method of preparing steel surfaces which, when viewed without magnification, shall be free of all visible oil, grease, dirt, dust, loose mill scale, loose rust, and loose paint. Tightly adherent mill scale, rust and paint may remain on the surface.
2.2 Mill scale, rust, and paint are considered adherent if they cannot be removed by lifting with a dull putty knife.

3. Appearance of the Completed Surface
3.1 The surface shall be roughened to a degree suitable for the specified paint system.
3.2 The entire surface shall be subjected the abrasive blast. The remaining mill scale, rust, or paint shall be tight and the surface sufficiently abraded to provide good adhesion and bonding of the specified paint system.
3.3 SSPC-Vis I or other visual standards of surface preparation agreed upon by the contracting parties may be used to further define the surface."

Michael Ray Wilson, part owner of the Claimant, testified that he was in charge of the work being performed on both bridge contracts. His understanding of a Method II cleaning was that the bridge first, would be pressure washed with water, then rusted areas would be blasted to white metal. Next, the rest of the bridge would be brushed off with a sandblaster to roughen up the surface for new paint. The remaining paint surrounding the bare metal areas would be feathered. Then, the bare metal areas would be painted with primer and feathered. Lastly, the intermediate and top coats would be applied to the entire surface. Wilson stated that, in using this method, a bridge could be cleaned and painted in four days. He testified that a Method I cleaning required that the entire surface of the bridge would be taken down to bare metal, which called for more labor, more sand, and more paint. He stated that using this method takes double the time that Method II would. Wilson also testified to the events that occurred in performing the District 5 contract. These events are basically undisputed. Wilson stated that a test pattern was performed on a rust spot. When IDOT's engineer, David Birdsong, scraped the painted area with a putty knife, the paint came off. The paint was feathered further, but the surrounding paint still came off. Seven or eight State inspectors went to the site and concluded that there was some foreign substance between the top coats and primer that was causing the paint to fail to adhere. Wilson stated that the contract was modified from a Method II cleaning to a Method I cleaning. Wilson testified that, before the August 15, 1988, start date of the District 3 project, he notified District 3, via telephone, of the delays in District 5, and that he would be unable to begin the District 3 project on time. Wilson was told to put his notification in writing. He testified that, on August 18, 1988, he wrote to Tom Jensen, bridge painting inspector for District 3,

informing Jensen that the start-up for the District 3 project would be late because of the delays in District 5. Wilson also requested additional time to perform the District 3 contract. In addition, Wilson stated that he talked to Jensen in early August to inform Jensen that the start-up on the District 3 project would be late. Wilson testified that Jensen said he had talked to George Davis of District 5, but that he did not remember what questions were asked. Wilson also testified that, at the preconstruction conference for the District 3 project on July 13, 1988, he informed IDOT's representatives that the Method II cleaning was not working in District 5.

Wilson testified that, when the District 3 project began, his company ran a test pattern, as was done in District 5. Wilson stated that, instead of using a dull putty knife, or scraper, to test the adherence of the paint, Jensen used a pocket knife, which Wilson said was razor-sharp. Wilson said Jensen told him that more paint would have to be removed. Wilson's crews removed more paint, but Jensen said that all of the paint would have to come off. Wilson testified that, if Jensen had used a dull putty knife, as required by the specifications, the paint would have adhered. Wilson stated that Jensen would not use a scraper that Wilson had offered to him, but stated that he always had used his knife and still would. Wilson testified that test patterns were performed on two or three other bridges with the same results. Wilson stated that he told Jensen that he would expect additional compensation for removing all of the paint, and Jensen said Wilson could put in a proposal, but chances were that he wouldn't win. After the project was completed, Wilson put in a request for additional compensation, which was denied December 11, 1990, in a letter from J. K. Kehl, engineer of construction for the Department. Wilson also testified that, if all of the paint were removed from the District 3 bridges,

the work could not be finished within the 40 days specified by the State as the length of the project. He stated that, because the State said the project would take 40 days, he assumed that the State was not contemplating that all of the paint would be removed from the bridges.

It is the Claimant's position that the requirements of the project changed from a Method II cleaning to a Method I when Jensen told Wilson that all of the paint on the bridges had to be removed.

Jensen testified that all of the paint on a bridge surface could be removed with a Method II cleaning, if the paint happened to be brittle. Jensen stated that he did not recall inspecting the test patterns on the District 3 bridges, but he denied telling Wilson that all of the paint had to be removed. He said that, on this project, nearly all of the paint was coming off with the brush-off blast because it was brittle. Jensen also said that if all of the paint on the bridge could be removed with a dull putty knife, that still would quality as a Method II cleaning. When asked if there was a point where Wilson had thought that enough paint had been removed, but Jensen insisted that more should be removed, Jensen replied, "Only if they went over the beam with the scraper and there was additional paint coming off." On direct examination, Jensen testified that he thought the contractor could have determined in the pre-bid inspection how easily paint would come off the bridges. However, on cross-examination, he stated that a visual inspection would not reveal whether all of the paint would have to be removed. Jensen also stated that, it was his opinion that no more energy or time was expended on the District 3 bridges than would have been expended in conducting the Method II brush-off blast.

Bill Flannigan, who was a bridge maintenance engineer in 1988, testified that he wrote the specifications in

question, and that the specifications had been amended before these contracts were bid, so that Method II cleaning would require a brush-off blast of an entire bridge surface, rather than spot-removal, which was required. Flannigan stated that a Method II cleaning no longer required blasting spots and feathering the existing paint. He said Method II required blasting the entire surface, removing all loose material, and inspecting the surface to determine if all of the paint was removed that should be removed. Upon questioning by the Commissioner, Flannigan admitted that it is possible that the districts were confused with the new Method II removal specifications, and some districts would have interpreted them differently than other districts.

George Davis, who was resident engineer for IDOT on the District 5 project, testified that the Claimant was given additional compensation, because it was discovered during the project that the paint was not bonded to the bridge beams. Davis said it was determined that this situation was not something that a contractor would have been expected to recognize when he bid on the project. He stated that, if a contractor was required to remove all three layers of paint on a bridge, that would be close to a Method I removal.

Richard Wayne Hahn, who was project review engineer for IDOT's Bureau of Construction in 1988, testified that he had final authority over the decision to grant the Claimant additional compensation on the District 5 project. He agreed with Davis as to the problem of paint not adhering on the District 5 bridges, and stated that part of the rationale for modifying the contract was that a visual inspection would not have revealed the problem. Hahn testified that, about a year and a half after the District 3 project was completed, he was assigned to investigate the

Claimant's claim for additional compensation. He stated that he never viewed the District 3 bridges in 1988, nor did he talk to Wilson in making his decision to deny the Claimant additional compensation. Hahn agreed with Jensen that, if a contractor took off 100 percent of the paint from a bridge during a Method II brush-off blast, that would not change the requirements to Method I. His interpretation of a brush-off blast was that the blast is normally done in spots, and the rest of the paint is left on the surface. Hahn said that his rationale for approving the additional compensation for the District 5 project, and denying it for the District 3 project, was that the situation in District 5 occurred early in the process when IDOT felt that there was a problem with the existing paint, and IDOT did not want to take chances with leaving paint residue, whereas, with the District 3 project, the work was apparently based on the brush-off blast which, in itself, did not create a change order. However, it should be noted that the alleged change in the scope of the work to be done on the District 3 bridges occurred as a result of the initial test blast—just as had occurred in District 5.

In deciding questions of what work is to be included in a State contract, we have held that the language of a contract is not controlling in determining the parties' agreement when other circumstances are also relevant in determining the agreement. (*Derenski v. State* (1992), 45 Ill. Ct. Cl. 297, 302; *Child Development Centers, Inc. v. State* (1984), 36 Ill. Ct. Cl. 138, 142.) Specifically, we have adopted the view that other circumstances, such as course of dealing, usage of trade, or course of performance, are also relevant to the inquiry of the parties' bargain-in-fact. The relevance of these considerations expresses a legislative policy in favor of courts' determining the actual agreement of the parties, and against enforcing printed contract terms in a mechanical fashion. (*Child Development Centers,*

*Inc. v. State, supra,* at 142.) Furthermore, where there is an ambiguity in the specifications, where there is no evidence to indicate that a visual inspection of the project site was negligent, or that industry custom calls for a greater inspection, and where the State fails to prove by expert testimony that specifications clearly showed the work to be included in the original bid, we have found that the Claimant did not simply make a bad bid. (*Larry Carlson & Associates, Inc. v. State* (1988), 40 Ill. Ct. Cl. 100, 110-111.) The State impliedly warrants that work could be performed according to the plans and specifications, that the specifications are adequate for performance of the job, and were free of material defects. (*Id.* at 111.) In this case, the rule of *contra proferentum* is applicable. A contract must be construed most strongly against the drafter. (*McCarthy Brothers Co. v. State* (1995), 47 Ill. Ct. Cl. 15, 35.) Under that rule, the risk of ambiguity, lack of clarity, and absence of proper warning is on the drafting party which could have forestalled the controversy. The rule pushes the drafters toward improving contractual forms, and it saves contractors from hidden traps, not of their own making. (*Id.*) Furthermore, there are many analogous cases decided by the Court, wherein the State has been required to pay for the services it requires and receives. (See *Johnson County Asphalt, Inc. v. State* (1987), 39 Ill. Ct. Cl. 36; *McCarthy Brothers Co., supra*; and *Harrison F. Blades, Inc. v. State* (1975), 30 Ill. Ct. Cl. 388.) In these cases, errors in plans or specifications by the State caused delays or increased costs that this Court found were to be borne by the State.

In the instant case, it is clear that there is much confusion about the interpretation of a Method II cleaning, even among IDOT's own employees. For example, Flannigan, who wrote the specifications, stated that, with a Method II cleaning, there would be no spot removal and

feathering. However, this seems to be in direct conflict with the specifications themselves, which, in section 509.06(b), state:

"* * * visible areas of rust which remain after the brush-off blast cleaning shall be prepared to bare metal in accordance with Method I above. An area of a minimum of one and one half (1-1/2) inches between the brush off area and the complete removal area shall be feathered using a dual action sander to provide a smooth transition between the new and old coatings."

In addition, there were inconsistencies within Jensen's testimony. Foremost is Jensen's testimony that he did not order all of the paint to be removed after the test blast, in spite of his testimony that he did not recall what occurred in connection with the test blast. Furthermore, Jensen's opinion that no additional time or energy was expended on the District 3 bridges is at odds with the evidence submitted by the Claimant as to how much additional time and materials were expended than had been anticipated in the original bid. An additional 455 gallons of red oxide paint, 1,000 bags of sand, usage of tools and vehicles, and payroll, apparently were necessary to complete the job. Although the Respondent objected to this evidence, it presented no evidence—aside from Jensen's opinion—to refute, or rebut, these contentions. From this evidence, and the testimony of Wilson that the work actually done could not have been completed in the required 40 days, it is apparent that there was more work involved than what was contemplated in the original contract.

We find that the districts were, in fact, confused as to the interpretation of the new Method II requirements. In light of such confusion, greater weight should be given to the course of dealing between the parties in the District 5 project. The undisputed facts show that, in District 5, existing paint failed to adhere after the test blast. Representatives of the State then changed the scope of the contract to require that all of the paint was to be removed from the

District 5 bridges, which merited the award of additional compensation. It is IDOT'S responsibility to uniformly interpret its specifications. Two districts within the same department should not be allowed to interpret the same specifications differently. If the two projects experienced the same difficulties, it is up to IDOT to ensure that the difficulties are dealt with in the same manner in both districts. Therefore, it must be determined whether identical difficulties arose in both projects. If so, then the Respondent should be held to the standards set forth in its course of dealing with the Claimant in the District 5 project, and the Claimant's award should be granted.

The basic facts regarding both projects appear to be identical. In both cases, it was determined after the initial test blast that additional paint had to be removed. Under the course of dealing set forth by the events that occurred in the District 5 project, requiring removal of all paint from bridge surfaces merits additional compensation. Therefore, the Court finds that the scope of the work under the District 3 project was increased, just as it was in District 5, and, thus, the Claimant did perform extra work beyond the scope of the original contract.

Even if the problems that arose in District 3 were identical, the Claimant must prove that the extra work was properly authorized. "Where the State vests a person with apparent authority to order services, the Claimant reasonably relied upon his apparent authority to bind the State, and the Claimant performed the services, the State cannot deny that the person had actual authority to bind the State." *Child Development Centers, Inc. v. State, supra,* at 142-143.

In the instant case, Jensen was vested with apparent authority to order services. It is clear that the Claimant's work had to conform to the inspector's requirements. It is

the inspector's job to ensure that work is done in conformity with the contract and the State's standards. The apparent procedure—as inferred from the events surrounding the District 5 project—is that, if the test blast revealed that more paint would have to be removed, the engineer or inspector would call in higher authorities from IDOT to determine whether the scope of the work should be changed. Jensen did not do this. Because Jensen could not recall what occurred during the test blast, the only credible evidence of what occurred comes from Wilson and Taylor. Both said Jensen required that all of the paint be removed. This Commissioner finds, as fact, that Jensen did order the Claimant to remove all of the paint from the District 3 bridges. The consequences of the failure of Jensen to seek advice from his superiors should not be borne by the Claimant. Therefore, we find that Jensen had apparent authority to request the additional work and, therefore, bind the State by his actions.

We address the Claimant's contention that the test performed on the District 3 bridges was improper. This issue is pertinent because, if the contention is true, the Claimant was required to perform unnecessary work at the behest of IDOT and should be reimbursed for such.

Bill Taylor, an employee of the Claimant who worked on the District 3 project, supported Wilson's version of the events that occurred on the District 3 project, as explained above in Wilson's testimony. Taylor also testified that Jensen refused to use a scraper, but instead used a pocket knife that Taylor had seen him repeatedly sharpening.

Jensen, however, testified that he did not recall inspecting the test pattern, but added that he usually would use a scraper handed to him by the painter. He stated that he never used a pocket knife as a test tool, but he

might have used one to lift a small piece of paint that had been overlooked. However, the Claimant introduced deposition testimony to impeach Jensen. In the deposition, Jensen said he has used a pocket knife in inspecting the paint on a bridge. When asked whose pocket knife he used, Jensen replied, "I usually use my own."

In light of Jensen's failure to recall the specific facts surrounding the District 3 test blast, and his inconsistent statements regarding his use of a pocket knife to perform testing, the only remaining credible evidence of what occurred during the District 3 testing is the testimony of Wilson and Taylor. There is also no dispute, according to the specifications and testimony of Department employees, that a pocket knife is an improper tool for testing the adherence of paint. The test was not performed according to specifications. The Court should add this fact to the balance in weighing the evidence. The Claimant should not be held responsible for extra work that was ordered as a result of improper actions by an agent of the Respondent.

Finally, regarding the amount of damages due the Claimant, evidence of the extra materials, equipment, and labor used on the District 3 project were presented. Although the Respondent objected to this evidence, the Respondent failed to produce contrary evidence.

In conclusion, we award the Claimant $4,687.50 for the improperly withheld liquidated damages, and $19,089.04 for extra work performed.

It is therefore ordered, adjudged and decreed that Claimant, Genie Construction Co., Inc., is awarded twenty-three thousand seven hundred seventy-six and 54/100 ($23,776.54), dollars in full and complete satisfaction of this claim.