(No. 79-CC-0784—

CHILD DEVELOPMENT CENTERS, INC., an Illinois not-for-profit corporation, Claimant, v. THE STATE OF ILLINOIS, Respondent.

*Opinion filed April 3, 1984.*

ALLAN G. LEVINE, for Claimant.

NEIL F. HARTIGAN, Attorney General (FRANCIS M. DONOVAN, Assistant Attorney General, of counsel), for Respondent.

HOLDERMAN, J.

Claimant in this cause, Child Development Centers, Inc., hereinafter referred to as CDC, is an Illinois not-for-profit corporation which operates a residential facility caring for developmentally disabled children. CDC is licensed by the Illinois Department of Children and Family Services as a child care institute. CDC, through its president and administrator, Noel Hill, began organizing its program plans in 1976, and by early 1977 Mr. Hill began communicating with various people from the Illinois Department of Mental Health and Developmental Disabilities (DMHDD) regarding the rate of payment for services to DMHDD-sponsored clients placed in the proposed CDC facility. CDC actually commenced operation as a group home in June of 1977.

A contract for services was signed on August 15, 1977, by and between DMHDD and CDC. The contract was to be effective from July 1, 1977, through June 30, 1978, and provided for a *per diem* rate of $14.79 per child to be paid to CDC by DMHDD. The record is clear that even prior to signing this contract, CDC and various employees of DMHDD agreed that CDC should wait at least six months during its initial operation under the contract in order to determine its actual operational cost data. This was particularly important since CDC, as a new facility, had no prior cost history. The record is clear that the intention of both parties was that the initial rate of $14.79 per child could and would be reviewed and modified upon receipt of the aforementioned cost data and that a revised rate would become retroactively effective.

Pursuant to this understanding, CDC submitted financial records and schedules to DMHDD in February of 1978. Respondent did not act on this summation and no explanation as to why Respondent failed to act is in the record. In June of 1978, CDC again prepared its financial schedules and resubmitted them to DMHDD. Once again, no action was taken by Respondent and there is no explanation on the failure to act in the record.

In March 1979, CDC received word from DMHDD that a new rate had been established in the amount of $29.18 per day per child and that the new rate was made retroactive to July 1978. This meant that CDC was to operate its facility from July 1, 1977, through June 1978 at the original *per diem* rate of $14.79 instead of making the new rate retroactive to the starting date of said institution.

The real question, therefore, is whether or not this is a case of lapsed appropriation or one of contract interpretation and oral representation which was made by the Respondent hereto as an explanation of the written contract.

Claimant is basing its claim upon the new rate, which it believes is the correct rate, for a payment of $29.18 *per diem* retroactively to July 1, 1977, in an amount of $34,200.00.

It is Respondent's position that the rate should not exceed the sum of $14.79 *per diem* until July 1978. The record is clear that Claimant did furnish the services for which it billed Respondent and that the services were satisfactorily performed by Claimant.

It is Claimant's contention that the contract in question did not contain the complete understanding, agreement and undertaking of the two parties but that the

actual agreement is shown by the correspondence of the parties which supported the proposition that CDC was to receive retroactive payment based on actual cost data.

The record abundantly supports the theory of Claimant that the actual cost of services rendered was not known by either party hereto, and that Claimant did keep records of the services rendered and the actual cost of the same and submitted this information to Respondent so retroactive payment could be made. The strongest evidence in this regard is that Respondent did offer in March of 1979 to retroactively pay for one year of service at the new rate which would have enabled Claimant to be paid for the period of July 1, 1978, to June 30, 1979, at $29.18 *per diem.*

The testimony of Mr. Hill, which was largely uncontradicted, is borne out by the record itself. In a letter from the Department of Mental Health and Developmental Disabilities to Mr. Hill, it discloses at some length the rate review for the first six months of operation which is in direct support of the Claimant's position and is not disputed by Respondent. It is interesting to note this letter was written August 15, 1977. The letter further states "this per diem will be modified by any amounts of other financial support available to or on behalf of such clients, pursuant to Department rules."

Respondent takes the position that a written contract was entered into and it was binding upon the parties and cannot be modified by parol evidence of the parties to the contract. It relies strongly on *Illinois Central R.R. Co. v. State* (1939), 10 Ill. Ct. Cl. 493, which is to the effect that a written contract cannot be changed by parol evidence of the parties.

The Court calls attention to *Personal Finance Co. v.*

*Meredith* (1976), 39 Ill. App. 3d 695, 702, where the court uses the following language:

"Furthermore, the language of a contract is not controlling as to the parties' 'agreement.' Other circumstances such as course of dealing, usage of trade or course of performance are also relevant to the inquiry of the parties' bargain in fact. We believe the relevance of these considerations expresses a legislative policy in favor of courts' determining the actual agreement of the parties and against enforcing printed contract terms in a mechanical fashion. Therefore we cannot state that the instant clauses can never be unenforceable on the basis of unconscionability."

The Court calls attention to *Independent Mechanical Industries, Inc. v. State* (1981), 34 Ill. Ct. Cl. 116, where an award was made for extra performance in a mental health center where the services were performed at the request of Respondent.

In the present case, Claimant is asking for money to pay for services actually rendered to Respondent and its wards and there is no question raised whatsoever as to the value of said services. The Court also calls attention to *Grogan v. State* (1978), 32 Ill. Ct. Cl. 46, where the Claimant encountered unforeseen difficulties in the performance of a contract and agreed to perform additional work upon assurances of additional compensation. It is Claimant's contention, which the Court believes is substantiated by the record, that in the present case additional services were performed for the benefit of Respondent and that it was clear from the very beginning that neither Respondent nor Claimant was in a position to tell what the actual cost of operating the institution would be until it had operated for at least six months.

The Court calls attention to *Wilson Electric Co. v. State* (1976), 31 Ill. Ct. Cl. 504, which states that where the State vests a person with apparent authority to order services, the Claimant reasonably relied upon his apparent authority to bind the State, and the Claimant

performed the services, the State cannot deny that the person had actual authority to bind the State.

The fact that the correspondence of Respondent and the testimony of Mr. Hill is not contradicted by any of the State's employees that Claimant had contact with bears out Claimant's contention. A careful reading of the record discloses the fact that Mr. Hill's testimony for Claimant gave specific dates of his contact with the individuals representing Respondent. It is further noted that he identified four particular individuals who worked for Respondent who indicated to him there would be a retroactive payment. Respondent, for some reason, did not see fit to call these individuals to the stand, so the testimony of Mr. Hill stands completely uncontradicted. A more significant fact supporting Claimant's contention is that the only witness the Respondent called testified to the fact that there was to be a retroactive payment. In this testimony, no limitation was placed upon the time involved. This is significant because it is in direct support of the contention of Claimant that the record states unequivocally that there was to be a retroactive payment.

In *Wilson Electric Co., supra*, the Court used the following language on contracts and the apparent authority of the individuals representing the State. The Court, in its opinion, stated that Respondent had vested a certain individual "with apparent authority to order the non-warranty work on the sound system and that Claimant reasonably relied upon his apparent authority to bind the State in performing the work. Claimant's employees did only the work requested by Rogers, and in these circumstances the State cannot now complain that Rogers did not have actual authority to bind the State."

In the present case, we have at least four individuals

with apparent authority to make retroactive payment, or agreement to that effect, bulwarked by the only witness of Respondent that the retroactive payment was contemplated.

It is the Court's opinion, after a careful review of the evidence produced in this cause, that it was the intention of all parties from the very inception of the contract in question that retroactive changes would be made and that the Claimant would receive retroactive payments based upon the actual services requested by Respondent.

Award is hereby entered in favor of Claimant in the amount of $34,200.00.