(No. 94-CC-1115–

JOHN P. DANIELS, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed December 6, 2000.*

HAYES, HAMMER, MILES, COX & GINZKEY (JAMES P. GINZKEY, of counsel), for Claimant.

LIETZ, BANNER & FORD (GARY LIETZ, of counsel), for Respondent.

## OPINION

JANN, J.

This matter was before Commissioner Shadid for hearing on December 11, 1998, in Champaign, Illinois. Both parties were represented by counsel.

### Statement of Facts

Claimant, John P. Daniels, filed a complaint on November 18, 1993, alleging injuries that occurred on December 7, 1992. Claimant alleged that the Respondent was guilty of one or more of the following negligent acts or omissions:

1. Placement of forklift extensions on the curb of a tunnel/ramp where they could not be seen for loading/unloading of freight;

2. Failure to provide adequate lighting in the tunnel/ramp of the University of Illinois Assembly Hall for contemplated users while performing loading/unloading functions.

At the trial Claimant, John P. Daniels, testified that he began driving trucks for Upstaging, Inc. (hereinafter "Upstaging") in 1976. Upstaging hauls staging and equipment for touring rock groups. In the 20 years that he drove for Upstaging, some of the groups that Daniels toured with were Styx, Bob Seger, Madonna, and others. Daniels was appointed lead truck driver for a tour by the rock group "Def Leppard." The lead truck driver assists in the coordination of loading and unloading of the trucks

and is appointed based upon a number of factors, including seniority, performance, and the ability to get along with other people. Def Leppard performed at the University of Illinois Assembly Hall in Champaign, Illinois, during the evening of December 6, 1992.

This tour required eleven (11) semi-tractor/trailer trucks. Each of the trucks is 60-65 feet long. After the trucks were unloaded at the University of Illinois Assembly Hall, Daniels had all the trucks arranged in the parking lot to facilitate the load-out, because Daniels and his drivers had to drive through the night to the next venue after the concert ended. On the date of this occurrence, Daniels slept in his truck and set his alarm for 15-20 minutes before the end of the concert. Because there were eleven (11) trucks involved, it had been intended that the trucks would be loaded "up top" in the parking lot. For both the unloading and reloading of the trucks, the Assembly Hall was obligated to provide two (2) forklifts, two (2) forklift operators, and forklift extensions. During the evening the weather started to deteriorate. It began to sleet and snow. When the weather becomes inclement, it is very difficult to load the trucks "up top" in the parking lot because the forklifts have difficulty going up and down the tunnel ramp safely. As a consequence, the trucks are backed down the tunnel ramp one at a time. This tunnel ramp at the Assembly Hall inclined from the parking lot down into the basement of the Assembly Hall. The tunnel ramp is twelve (12) feet wide with a one-foot curb on each side. When a truck is in the tunnel one has to side step in order to get by the truck.

Daniels recalled that it was the third truck that was being loaded when he was notified that his truck would be next. He had been in the basement of the Assembly Hall for more than one-half hour prior to going to get his

truck. He was side stepping on the curb by the truck and had gotten to where he was next to the truck's cab. He stepped on forklift extensions that had been laid on the curb. The forklift extensions wobbled, his foot slipped off and became pinned between the curb and truck tire as he fell in a twisting motion. Both of his feet had been on the curb as he was side stepping by the truck. His foot came down on top of the forklift extensions, they wobbled, and he twisted and fell sideways. Daniels did not see the fork-lift extensions and he testified that he never expected them to be on the curb. Daniels testified that there was nothing he could have done to prevent or avoid this oc-currence. Daniels was flown the next day to Detroit. He was under the care of Dr. Pickering from the day after the accident until June of 1993. Daniels was unable to re-turn to work until his discharge by Dr. Pickering because one cannot operate a semi-tractor/trailer while wearing a leg cast. At the time of his fall, Daniels was contracted to drive for the remainder of the Def Leppard tour and he was also under contract for both the Paul McCartney and Madonna tours. His lost wages totaled $24,920.

Dr. Pickering testified that Daniels had a torsinoal-type injury on both his right tibia and right fibula. Daniels was initially placed in a long leg, non-weight bearing cast on December 15, 1992. A shorter cast was applied on January 13, 1993. The short-leg cast was removed on March 1, 1993, and physical therapy was started. Dr. Pickering testified that the fracture affects blood supply to the lower right leg. He also described what he referred to as "rest pain." After sitting or lying down for any period of time and then getting up to walk, a patient will have difficulty with their knee and the fracture site. He testi-fied that Daniels' loss of range of motion, suffering from rest pain, and sensitivity to cold weather are all perma-nent conditions. Medical expenses were $5,043.35. Dr.

Pickering's opinion was that the spiral fracture of the tibia and fibula were causally related to the incident at the University of Illinois Assembly Hall.

Plaintiff's Exhibit No. 8 is an "indoor technical rider." This document dictates what is to occur at the concert and requires the University of Illinois to provide two (2) forklifts with operators. Prior to this concert, the University was advised that, in addition to the forklifts and operators, eight-foot forklift extensions would be needed for this particular concert. The University therefore fabricated a set of eight-foot lift extenders.

Fred Rhodes was the Assembly Hall operations manager and it was his job to arrange for the forklift and forklift operators. The forklift operators are called "Assembly Hall attendants" and they are university employees. These attendants are members of the local Operating Engineers Union and they have been specially trained to operate forklifts in the Assembly Hall. Rhodes testified that no one other than these specially trained operators are allowed to operate forklifts in the Assembly Hall. At no time during the evening of December 6, 1992, did Rhodes see anyone other than Assembly Hall attendants using the university's forklift or forklift extensions.

Robert Aldridge was the Assembly Hall stage manager and he was present for the duration of the concert and load-out. He also testified that Assembly Hall attendants are specially trained to operate forklifts. At no time during the concert and load-out did Aldridge see anyone other than the Assembly Hall attendants operating their forklifts.

Aldridge also testified that he was aware that the special eight-foot forklift extensions were needed to reload a piece of equipment called a "drum riser." Daniels

testified that the eight-foot forklift extensions were used only to load and reload the drum riser. They were not needed for any other equipment. The drum riser got reloaded into the very first truck that evening. That truck was loaded prior to Daniels' fall.

The evidence deposition of Mark Spring was introduced. Spring testified that he was employed as production manager for and with Def Leppard for this particular tour. Spring was familiar with the load-out process. Spring testified that forklift extenders were used for things other than a drum set. These things included most of the stage set or the rolling stage. According to Spring, the rolling stage could not unload or reload onto a truck without the use of these forklift extenders. Spring testified that at the time of the fall of the Claimant, John Daniels, it was necessary that the forklift extenders would still be used later in the evening to finish the loading out process.

## Arguments of the Parties

The Claimant argues that under the applicable provisions of the premises liability act at the time in question, the duty owed to persons on the premises is that of reasonable care regarding the condition of the premises. The owner of the premises must use reasonable care and caution in keeping the premises reasonably safe for use by one lawfully on the premises. (*Selby v. Danville Pepsi Cola Bottling Co.* (4th Dist., 1998), 169 Ill. App. 3d 427, 523 N.E.2d 697.) These same duties apply to the State of Illinois. *Ratts v. State* (1986), 38 Ill. Ct. Cl. 138, *Nolan v. State* (1983), 36 Ill. Ct. Cl. 138.

Claimant argues that the Respondent has a statutory duty to exercise reasonable care regarding the condition of its premises. Claimant argues that Respondent failed its duty by placing the eight-foot forklift extension on the

curbs, knowing full well that Claimant and other persons lawfully on the premises would necessarily have to walk through that area as part of the load-out. Claimant argues the incontroverted evidence in this cause is that the University of Illinois Assembly Hall controlled the forklifts and forklift extensions on the date in question.

Next Claimant argues that he need not prove actual or constructive notice when a condition results from Respondent's activities. Claimant argues that whether Respondent knew, or in the exercise of reasonable care, should have known of the dangerous condition of the forklift extension being placed on the curb, is not an integral part of Respondent's operation, and where it may be reasonably inferred that the condition of the instrumentality was due to the negligence of the Respondent as opposed to the actions of third parties, then it is not necessary for Claimant to establish that Respondent has actual or constructive knowledge of the condition. *Higgins v. White Sox Baseball Club, Inc.* (7th Cir., 1986), 787 F.2d 1125.

The Respondent argues that constructive notice is required and cites *Dunbar v. State* (1992), 45 Ill. Ct. Cl. 175, for the proposition that the Claimant must also establish that the State had actual or constructive notice of an alleged defect or dangerous condition before recovery is allowed. Respondent argues that the instrumentality or the condition causing the injury was a result of something which is not an integral part of the business of the operation for the University of Illinois. They argue that the extenders were fabricated on the day of the performance pursuant to written instruction and were certainly not an integral part of the operation of University of Illinois, nor were they related to the performance of its business.

Respondent also argues that, if this were a dangerous condition, that it was open and obvious in a tunnel that was lit by at least six pairs of long fluorescent light bulbs, lining the corners of the side wall with the ceiling on both sides of the tunnel. However, there was testimony that, when trucks are backed into the ramps, their trailers tend to block the light.

Respondent further argues that the duty of the State differs from that of a non-State property owner. They cite *DeLeo and Hafron v. State* (1993), 46 Ill. Ct. Cl. 44, for the proposition that the State is not an insurer against accidents occurred to invitees on State property. The *Hafron* case stated that to show negligence, Claimant must prove its negligence in its maintenance of the premises in that it had actual or constructive notice of a dangerous condition. The duty of the State, therefore, may be different from a non-State property owner. Respondent further argues that the condition of the presence of the forklift extenders was known, open, obvious, and well within the expectations of this Claimant, John Daniels.

## Conclusion

Respondent argues that the claim should be denied for a number of reasons. First, the presence of the forklift extenders was known, experienced by and obvious to the Claimant, John Daniels. Although that may be true, the Claimant could not reasonably expect the forklift extenders to be placed on the curbing along side of the ramp, when the trucks are in place for loading, when the curb was the only place where individuals could walk past the trucks. The facts that extenders were needed to be used in the loading out of the equipment and the fact that they were placed, presumably by a University of Illinois attendant, on the curbing where someone would have to walk past the trucks are two separate matters.

Secondly, the Respondent argues that the individual involved in the production management team had exclusive and sole direction, control, supervision, and authority in the loading out process and, therefore, the utilization of the forklift extenders. However, the evidence is clear by the testimony of the Respondent's own witnesses, Fred Rhodes and Robert Aldridge, that the only people handling the forklift or the forklift extensions on the night in question were the Assembly Hall attendants.

We find the record indicates that only University of Illinois Assembly Hall attendants could have placed the forklift extenders in the position where Claimant was injured and therefore, notice was imputed when the attendant placed the extenders on the curbing next to the ramp. The Claimant testified that he did not expect the forklift extenders to be placed in such a position and therefore was not looking to be aware of them. Here the Claimant's failure to exercise caution would establish some liability on his part. The Respondent argues that liability on the Claimant's part would be in excess of 50%. The Commissioner recommended that any award that the Court may give the Claimant be reduced by 40%.

Claimant is hereby awarded damages of $5,043.35 for medical expenses, $24,290 for lost wages including his per diem expenses of $45-50 and $20,000 for pain and suffering and permanency of the injuries, for a total award of $49,963.35. We hereby adopt the Commissioner's recommendation as to Claimant's comparative negligence at 40% and reduce the award accordingly to $29,978.01.

Finally, we must address the issue of the workers' compensation settlement received by the Claimant in the amount of $16,440.50. The Court is unaware of any lien that has been filed by the employer as required by the Workers' Compensation Act, in which case the employer's

lien can be satisfied from an award to the Claimant. Claimant's brief addresses this briefly in his conclusion that the workers' compensation benefit that the Claimant received constitutes a lien against Claimant's award in the Court of Claims. See *Paschal v. State* (1999), 43 Ill. Ct. Cl. 229.

Claimant is hereby awarded the sum of $29,978.01 as full and final satisfaction of his claim which is hereby dismissed.