(No. 78-CC-1644—

RICHARD ERNAT and JAMES ERNAT, Claimants, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed January 6, 1984.*

PETER F. FERRACUTI & ASSOCIATES, P.C. (MARK CYR, of counsel), for Claimants.

NEIL F. HARTIGAN, Attorney General (FRANCIS M. DONOVAN, Assistant Attorney General, of counsel), for Respondent.

ROE, C.J.

This is a claim brought by Richard Ernat and James Ernat against the State of Illinois. In their complaint the Ernats allege that in the spring of 1970, they, along with Ignatius Ernat, Anne Ernat, Janice Ernat, and Marlene Ernat, entered into negotiations concerning the sale of 221.42 acres of land located in La Salle County with the State and Department of Conservation. The Ernats negotiated with Truman Esmond whom they claim was an agent for the State. Attached to the complaint is an agreement for warranty deed signed by Ignatius Ernat and Anne Ernat and by Truman Esmond, purportedly as an agent for the State of Illinois. The agreement contained, among other things, provisions allowing the Ernats to plant and harvest the 1970 crops and obligating the State to lease back the land to the Ernats so long as it was leased for agricultural purposes.

The negotiations finally culminated in a closing in June of 1970. A warranty deed transferring title to the State was recorded on June 15, 1970.

Although the deed reserved the Ernats' right to plant and harvest the 1970 crops, it made no reference to the lease-back provision contained in the agreement for warranty deed. For the next three years the State did lease most, if not all, of the land to the Ernats, during which time the land was farmed by the Ernat family. In 1973 the Ernats were given a notice to quit. After taking bids, the State leased the land to William Lucas and Jack Mills.

In 1974 these two planted grass along with an oat crop and were allowed to harvest the oats, as well as the straw. The Claimants contend, therefore, that the State breached its contract, the agreement for warranty deed, by leasing the land for agricultural purposes to ones other than the Ernats. They seek damages in the amount of sixty-three thousand ($63,000.00) dollars, the profits they claim would have been realized if they were allowed to lease and farm the land during 1974.

A hearing was conducted before Commissioner Bruno P. Bernabei, who heard testimony, and received evidence and the briefs and arguments of counsel. The commissioner has duly filed his report, together with the transcripts, exhibits, and briefs now before us.

The facts and circumstances of this transaction between Claimants and the State are complicated. They raise many issues and sub-issues. The resolution of this matter, however, centers on two basic questions. The first issue is whether there did, in fact, exist an enforceable contract between the Ernats and the State, which includes the disputed lease-back provision. The second issue, and really a sub-issue to the first, is whether Truman Esmond was an agent for the State, specifically regarding the lease-back provision. The resolution of these two questions requires a close examination of the facts presented through the evidence at the hearing.

The Claimants' evidence, particularly the testimony of Ignatius Ernat, showed that sometime in March of 1970, Ignatius Ernat and his son, James Ernat, were visited by Truman Esmond. Other than a telephone call from Mr. Esmond setting up the meeting, the Ernats had never spoken to or known Truman Esmond. At the meeting held at the Ernat home, Truman Esmond represented himself to be a representative of the Department

of Conservation and the State, and said that he was interested in purchasing the land in question for the State. There was some discussion between Ignatius Ernat and Esmond concerning price and it was finally agreed that they would meet at a later date.

Approximately one month later, Ernat and Esmond met again. They drove around the land in question as Ernat pointed out to Esmond the various parcels he wanted to sell. Ernat testified that he told Esmond that if he were to sell, he would insist on reserving the right to lease and farm the land so long as it was used for agricultural purposes. Esmond responded that it was all right with him and that he was almost sure that it was all right with the State. Ernat insisted further that the reservation be included in the deed and Esmond agreed.

On April 6, 1970, a document titled agreement for warranty deed was executed by Ignatius Ernat and his wife, Anne Ernat, and by Truman Esmond, purportedly on behalf of the State. The agreement contained the lease-back provision. There were two additional agreements for warranty deed executed as well, also dated April 6, 1970. One was signed by Ignatius, Anne, Richard, and Janice Ernat, and Esmond, purportedly on behalf of the State. The other was signed by Ignatius and Anne Ernat only. The matter ultimately proceeded to a closing on June 15, 1970, where both sides were represented by counsel and on that day the deed was recorded. As indicated, the deed did not contain the lease-back provision. The Ernats were paid in full and did, in fact, enter into leases for each of the next three years.

Ignatius Ernat testified that he dealt only with Esmond regarding the negotiations and ultimate sale of the land. Subsequent to the sale he did have several conversations with Ron Fitzgerald, presumably a Depart-

ment of Conservation official. Concerning the yearly leases, Ernat told him that he felt that he was entitled to farm the land since he was good enough to sell it to the State in the first place, and therefore, he felt that the State should give him the first chance to farm it. Ernat also spoke with Robert Corrigan, chief of the land acquisition department for the Department of Conservation, approximately six months following the closing. Ernat told him that he should have first preference to rent the land and Corrigan agreed. When the State requested bids for the 1974 lease, Ernat submitted a bid, but lost to Lucas and Mills.

Truman Esmond testified that he had worked many years for the State as an appraiser and as a negotiator for the purchase of land on behalf of the Department of Conservation, as well as other State agencies. He stated that his authority to negotiate a purchase and sign agreements was absolute. He stated that procedurally he would draw up an option on a form that he used. In this particular case he was obviously referring to the agreement for warranty deed. He testified that the agreement for warranty deed forms were secured from his personal office and that he did not use the forms provided by the State because they contained too much fine print. The options would be sent by him to the office of the Director of Conservation and he stated further that the agreements reached by him as set out in the option were always honored. In this case, as was customary, Esmond paid one thousand ($1,000.00) dollars of his own funds to the Ernats upon signing of the agreement. This was the amount of the stated consideration in the agreement. He would customarily be reimbursed by the State following the closing of the transaction he had negotiated. Although he claims his authority was absolute, Esmond testified that he had no authority to obligate the State of Illinois

beyond the money that he had personally paid, which in this case was $1,000.00.

Esmond testified that he sent all three agreements for warranty deeds to the Department of Conservation, Springfield office, including the two agreements that he had signed as agent for the State. However, the State introduced a letter from Esmond to Mr. Corrigan dated April 11, 1970, which read in full, "Enclosed is the duly executed Agreement for Warranty Deed on the Ignatius Ernat and Anne Ernat [sic] in Deer Park Township, LaSalle County, Illinois". Attached thereto and introduced into evidence was the agreement signed only by Ignatius and Anne Ernat. There was no evidence that any State official received the other agreements signed by Esmond, or that they were even aware of their existence. When confronted with the letter and asked when he sent the other agreements to Springfield, he stated that he could not say, but that he would have thought it would have been at the same time. It is noteworthy that the complaint alleged a breach of contract arising from the agreement for warranty deed made a part of the complaint as an exhibit, and which was one of the two agreements signed by Esmond and never provided to a State official.

The Department of Conservation land acquisition chief, Robert Corrigan, testified for the State. He stated that land would be procured by the Department by first getting approval from the Governor and legislature with respect to appropriations. Negotiations with potential sellers would then be instituted by Department employees. Corrigan knew Esmond in 1970 and during that time Mr. Esmond was providing contractual services as an appraiser and also provided other related services which presumably included those of a negotiator. When Esmond did work out proposed agreements with a land-

owner, they would be sent to the Department of Conservation for either approval or disapproval.

Corrigan testified that he did indeed receive the agreement signed by Ignatius and Anne Ernat attached to Esmond's letter of April 1970. He never saw the other two agreements signed by Esmond until after this lawsuit was initiated. To Corrigan's knowledge at all relevant times, Esmond had never signed his name to any agreement as agent for the State. In this case, Esmond obviously did sign two agreements and advanced $1,000.00 which he was ultimately reimbursed for by the State. Corrigan stated that he believed Esmond was advancing money as a gamble of his own to later see if the State would be interested in acquiring the property in question. As indicated previously, Esmond himself stated that he could not obligate the State beyond the $1,000.00 that he had advanced.

Corrigan testified that prior to closing any transaction the proposed agreements and deeds had to first be approved by the Attorney General. In this case, Corrigan submitted several documents to the Attorney General, including the agreement for warranty deed received by Corrigan, as well as a proposed deed. The Attorney General's report and opinion to Mr. Corrigan was received into evidence, and among other things, it specifically disapproved and rejected the lease-back provision contained in the agreement, although it did approve the provision granting the Ernats the right to plant and harvest the 1970 crops.

Corrigan testified that in light of the Attorney General's opinion he did not agree to the lease-back provision. He conveyed all of this to Mr. Esmond, as well as Assistant Attorney General Anderson, who represented the State at the closing on June 15, 1970. The deed recorded

following the closing complied with the Attorney General's opinion in all respects.

Corrigan also testified to a conversation he had with Ignatius Ernat in December of 1970, several months after the closing, at which time Ernat told him that he had farming rights through 1971. He was apparently referring to the first year lease. Ernat asked Corrigan for consideration beyond 1971 if the land was going to continue to be farmed. Corrigan told Ernat he would do what he could and, as indicated, leases were given to Ernat for the years 1972 and 1973.

While the foregoing recitation of the facts is lengthy, it is all relevant to the resolution of this case. As earlier stated, the two crucial issues in this case are interrelated. They concern Truman Esmond's status and the existence of a binding contract containing the lease-back provision. We find that both issues must be resolved in favor of the State. The Claimants have not demonstrated that Truman Esmond was an agent of the State such that he had the authority to unilaterally bind the State to the lease-back provision.

The Claimants correctly state the three situations wherein a principal-agent relationship is established, and wherein the acts of an agent bind the principal. First, the agent may have actual authority from the principal. Second, the agent may have apparent authority, and third, the agent may have inherent power independent of actual or apparent authority. (*Roscoe Company v. Lewis University College of Law* (1979), 79 Ill. App. 3d 1098, 398 N.E.2d 1083.) In addition, the Claimants correctly stated the law of ratification, the doctrine that binds the principal where he confirms the actions of one originally unauthorized and the principal retains the benefits of the transaction. (*Schoenburger v. Chicago*

*Transit Authority* (1980), 84 Ill. App. 3d 1132, 405 N.E.2d 1976.) The evidence does not show the existence of any of these agency relationships sufficient to bind the State to the lease-back provision.

Esmond's only actual authority given to him by the State was to negotiate for the State and to submit the negotiated terms to the Department of Conservation and, ultimately, the Attorney General for approval or disapproval. He had no actual authority to bind the State unilaterally to the terms he negotiated and he admitted as much during his testimony. From his testimony it is clear that he received no such implied authority from the Department of Conservation. This is clear also from *Robert Corrigan's testimony.*

Apparent authority arises when the principal, by his conduct towards the third party, induces the third party to reasonably believe that the claimed authority of the agent exists. In short, a principal is bound by the authority that by his own acts he appears to give. *Lynch v. Board of Education* (1980), 82 Ill. 2d 415, 412 N.E.2d 447.

When dealing with the subject of apparent authority, this Court has noted that the ability of a person with apparent authority to contract is a point of serious consequence when dealing with State entities. The State cannot be bound by agents with apparent authority rather than actual authority in most situations because such a policy could be disastrous to the State's budget. *Agles v. State*, No. 81-CC-1130, at 9-10, filed October 19, 1983.

Even if this was a situation where the State could be bound by apparent authority, the Claimants have failed to show its existence in this case. Neither the State nor Department of Conservation officials acted in a manner towards the Ernats which would cause them to believe

that Esmond had the *carte blanche* authority that he claimed. In fact, the Ernats never knew Truman Esmond prior to the time he first contacted them. Furthermore, the Ernats never spoke to any State official about the transaction until after the closing was completed. The State did nothing to cause the Ernats to reasonably believe that Esmond had the power to unilaterally bind the State to the lease-back provision. The Department of Conservation's failure to personally advise the Ernats of the Attorney General's rejection of the lease-back provision contained in the agreement provided to Corrigan does not constitute conduct giving rise to apparent authority. There would be no reason for the Department to advise the Ernats since the agreement was not signed by Esmond and, therefore, there was no reason to suspect that Esmond had attempted to bind the State. The simple fact is that Truman Esmond alone claimed authority. By the Ernats' own conduct it is difficult to understand that the Ernats believed that Esmond had his claimed authority. The Ernats executed a deed that did not contain a lease-back provision although Ignatius Ernat testified that his agreement with Esmond was that the deed contain such a provision. In discussions subsequent to the closing, Ernat felt that he was entitled to the three one-year leases not because of any contract provisions apparently, but because he felt he was entitled to rent the land since he was good enough to sell it to the State in the first place. In addition, the Ernats tendered a bid for the 1974 lease instead of relying on their alleged contract rights.

For the same reasons above mentioned, there is no rational basis to find that Esmond had any inherent authority to bind the State.

The doctrine of ratification is equally non-applicable

in this case. The evidence simply showed that Corrigan received a proposed agreement containing the lease-back provision. He submitted it to the Attorney General who disapproved it. Corrigan communicated this to Esmond, as well as closing attorney Anderson. The closing then took place with no reference to the lease-back. There was no ratification.

The Court agrees with the arguments advanced by the State in its brief, concerning the basic law of contracts and offer and acceptance. The agreement submitted by Esmond to Corrigan and then to the Attorney General was an offer by the Ernats that was rejected. The terms contained in the deed ultimately executed represented the full agreed-upon terms by the parties.

An additional issue that this case raises is the question of whether or not the land was in fact leased to Lucas and Mills in 1974 for agricultural purposes. It may very well be that it was not. If it was not, there would, of course, be no breach of contract even if one existed containing the lease-back provision, and even assuming legal authority on the part of Truman Esmond. This issue unfortunately was not adequately addressed at trial nor in the briefs other than by fleeting reference.

Based on the foregoing, it is hereby ordered that this claim be, and the same is, hereby denied.