# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 02-4093

MISTI CRULL,

*Plaintiff-Appellee*,

v.

WILLIAM SUNDERMAN, JOHN W. RAPP,
Justice, LINDSAY PARKHURST, et al.,

*Defendants-Appellants*.

_____

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 01 C 1583—**John W. Darrah**, *Judge.*

_____

ARGUED OCTOBER 24, 2003—DECIDED SEPTEMBER 17, 2004

_____

Before BAUER, EASTERBROOK and RIPPLE, *Circuit Judges*.

RIPPLE, *Circuit Judge.* Misti Crull brought this action pursuant to 42 U.S.C. § 1983 against her former employer, the State of Illinois Judicial Inquiry Board ("JIB"), individual JIB members and employees. She alleged constitutional violations as a result of the termination of her employment.[1]

---

[1] Ms. Crull also alleged a deprivation of her liberty interests resulting from defamatory comments. Subsequently, however, the defendants moved for summary judgment on the ground that
(continued...)

The district court dismissed the JIB as a party be-cause it was immune from suit in federal court. The parties then filed cross-motions for summary judgment. The remaining defendants asserted that summary judgment was appropriate because Ms. Crull had no property interest in her continued employment, and, therefore, they were entitled to qualified immunity. The district court denied both motions. The defendants appealed. We now reverse the judgment of the district court.

# I

# BACKGROUND

## A. Facts

### 1. Parties

The 1970 Illinois Constitution created the JIB for the pur-pose of investigating judicial misconduct and mental or physical incapacity of the State's judges. *See* Ill. Const. art. VI, § 15(b). The JIB is composed of board members ("Board"), a full-time Executive Director, two full-time investigators and other support staff. The Executive Director is appointed by the Board to supervise the investigators, to assist with budget preparation and to be the spokesperson to the media, among other responsibilities. The JIB hired Ms. Crull in 1997 as an investigator. Defendants, William Sunderman and Justice John W. Rapp, were members of the Board in 1997, and defendant Lindsay Parkhurst became a board

---

[1] (...continued)
Ms. Crull had responded in an interrogatory that she no longer wished to pursue her deprivation of liberty claim. The court dismissed the liberty interest claim in August 2001. Ms. Crull does not appeal this dismissal.

member in 1999. Mr. Sunderman became Chairman of the JIB in August 1999 and was Chairman at the time the Board terminated Ms. Crull's employment. Finally, defendant Kathy Twine was the JIB Executive Director at the time of this appeal; she had been named to that position in 1998. Ms. Twine replaced the former Executive Director, Sue Tohinaka, after Tohinaka's death in 1997. Ms. Twine also fills the role of General Counsel to the JIB. *See* R.13 ¶ 7.

### 2. Purpose and Structure of the Judicial Inquiry Board

As stated above, the 1970 Illinois Constitution created the JIB to conduct investigations and to receive or initiate complaints concerning judges. *See* Ill. Const. art. VI, § 15(b) & (c). The Board may file complaints with the Courts Commission if there is a reasonable basis to charge a judge with misconduct or to allege physical or mental disability which renders the judge unable to perform judicial duties. *See id.* at § 15(c).

The JIB's first meeting was held on October 6, 1971, and was called to order by Governor Richard Ogilvie. At that initial meeting, Governor Ogilvie described the agency as an independent agency and commented that the only authority the Governor's office had over the agency was to appoint seven of its nine members. In 1992, after an inquiry from the JIB, the Chief Legal Counsel of the Department of Central Management Services ("CMS") provided a legal opinion that stated that the JIB was not subject to the provisions of the Personnel Code.[2] *See* R.41, Ex.4, Letter of Oct. 19, 1992. In 1993, the Attorney General concluded that the JIB was an

---

[2] Generally, the Personnel Code sets forth the policies and procedures for the hiring and firing of employees in state agencies under the jurisdiction of the Governor.

independent state agency, part of the judiciary, and, therefore, was exempt from the state personnel rules. *See id.,* Letter of Feb. 24, 1993. The JIB formally adopted the Attorney General's opinion in 1993. *See id.,* Minutes of March 12, 1993.

Unlike other state employees, generally speaking JIB employees are not hired from the CMS list of eligible employees but by the Board; the Board's hiring decisions were not restricted by the requirements of CMS. The JIB employees do not have a written contract for any specific employment period, and the Board has no formal grievance or discharge procedures. In some respects, however, JIB employees receive similar treatment to CMS employees. Both parties agree that during the relevant time period (1) JIB employees were evaluated on CMS forms, (2) vacation day forms stated "Personnel Code Vacation Days Earned" and (3) JIB adopted the model sexual harassment policy promulgated by the Governor for agencies within his jurisdiction. *See* Appellee's Br. at 4; Appellants' Br. at 13. Additionally, Ms. Crull's life and health insurance were administered through CMS. Ms. Crull asserts that, when the JIB had no policy of their own, it would follow the state employee Personnel Code. The defendants claim that they looked to the state policies "just to get a parameter" but have not necessarily followed the policies as provided by the Personnel Code. Appellants' Br. at 12.

### 3.  Hiring of Ms. Crull

When Ms. Crull was hired in 1997 as an investigator for the JIB, she was not hired through CMS; she applied directly to the JIB. Ms. Crull interviewed with Executive Director Tohinaka and, like other JIB employees, did not meet with the Board prior to her offer of employment. At some point

during the hiring process, Executive Director Tohinaka told Ms. Crull that she would be placed on a six-month probationary period, after which "they have to have a reason to fire you." R.44, Ex.3 at 21. Ms. Crull also offered testimony that she "was assured that the structure of the JIB was designed to produce credibility and due process for the JIB staff" as well as for the judges they investigate. R.44, Ex.4, Crull Aff. ¶ 2. Executive Director Tohinaka sent Ms. Crull a letter advising her of the date on which she should begin work, her starting salary and that she would receive "full State of Illinois Employee Benefit[s]." R.44, Ex. 4, Letter of Sept. 30, 1997. The Board set Ms. Crull's salary, which does not depend on any set pay scale.

In a 1999 letter responding to Ms. Crull's inquiries about sick leave, the Labor Relations Manager/Chief Labor Relations Counsel for the CMS informed Ms. Crull that the JIB was "not under the jurisdiction of the Governor." R.41, Ex.9. The letter informed Ms. Crull to address the issues with Executive Director Twine and explained that CMS Labor Relations "generally do[es] not give advice regarding matters that are not within the Governor's jurisdiction." *Id.* Further, in June 2000, Board Chairman Sunderman told Ms. Crull she was an at-will employee.

### 4. JIB Employees Placed on Probation

In addition to Ms. Crull, at least four other JIB investigators were placed "on probation" when they started their employment. "[F]ormer Executive Director Sue Tohinaka and . . . Executive Director Twine had discretion to put employees on probation . . . ." R.46 ¶ 14. Investigators Tom Jennings, John Valencia, Wayne McClory and Dan Marello were all placed on a six-month probationary period upon being hired. Furthermore, based on an initial conversation

with Executive Director Tohinaka, McClory believed he could be fired only for cause after his six months' probation. The Board placed Executive Director Twine on probation as a new employee in January 1998 and removed her from probation at their October 9, 1998 Board meeting. *See* R.44, Ex.19 at 2.

Several employees also were placed back on probation when they experienced difficulties in performing their responsibilities. Executive Director Tohinaka told Jennings that he was being returned to probationary status. Executive Director Twine told John Valencia that his probation had been extended for another six months. *See* R.44, Ex.9. Both employees were provided a written explanation of why they were placed back on probation and an opportunity to improve their performance. Finally, the defendants acknowledge that "[t]he JIB, through interim Director Sandra Otaka, also extended McClory's probation during the transition between Executive Directors after Tohinaka's death so that the new director 'could fire [him] more easily.'" Appellant's Br. at 16 (quoting R.44, Ex.8, McGuire Dep. at 69-70) (alteration in original).

### 5. Board's Past Termination of Employees

Prior to Ms. Crull's termination, there is evidence of only one other termination, the Board's termination of Jennings in March 1997. The Board did not provide Jennings with a hearing but made its decision based on "Director Tohinaka's packet of materials . . . including Tom Jennings' March 5, 1997 memo in response to his February 24, 1997 Annual Performance Review." R.41, Ex.14. In announcing its decision to terminate Jennings, the Board expressly stated the decision was "with authorization" to the Executive Director "to determine a suitable effective date which gives him at least two weeks notice." *Id.* at 1-2.

Prior to Ms. Crull's dismissal, the Board became concerned about her ability to conduct investigations. Specifically, the Board was concerned about "her judgment, her ability to write unbiased reports, her reliance on unsubstantiated rumors and her ability to separate rumors from credible evidence." R.41, Ex.12 at ¶ 5. The outside counsel also expressed concerns about even using her as a witness before the Courts Commission. *See id.* The Board determined to terminate Ms. Crull because it had lost confidence in her investigative abilities. *See id.; see also* Appellant's Br. at 11 (citing to record). On October 13, 2000, Ms. Crull attended a meeting with three Board members, defendants Sunderman, Rapp and Parkhurst, and the Executive Director, Kathy Twine. At this meeting, those present informed Ms. Crull that the Board had voted unanimously to terminate her employment. She was given no prior warning or hearing but was provided two additional weeks of pay.

## B. District Court Proceedings

On March 6, 2001, Ms. Crull filed this action pursuant to 42 U.S.C. § 1983. Specifically, Ms. Crull alleged that she had a constitutionally protected property interest in her employment and that her dismissal violated her Fourteenth Amendment rights to due process of law.

Both parties filed motions for summary judgment. In ruling on the motions, the district court focused on whether Ms. Crull had put forth facts establishing a property interest in her continued employment. The court determined that a property interest could arise from an independent source, such as state law, or by a clearly implied promise of continued employment. The second method, the court explained, included any mutually explicit understandings between the parties. *See* R.62 at 7.

The court refrained from determining whether a state statute or regulation created such an obligation, noting that the parties disputed this point and there was no case law discussing whether the Personnel Code applied to the JIB. The court determined that the resolution of that issue was unnecessary because there was a genuine issue of material fact regarding whether a property interest arose based on a clearly implied promise of continued employment. Accordingly, the court denied the motions for summary judgment.

Once it determined there was a triable issue of fact regarding Ms. Crull's property interest in continued employment, the district court addressed the defendants' claim of qualified immunity. The court started with the two-step inquiry for qualified immunity claims. First, it asked whether Ms. Crull had stated a violation of her constitutional rights. The court determined that Ms. Crull did raise a triable issue as to whether she could only be terminated for cause. Therefore, the court held, Ms. Crull had alleged a violation of her constitutional rights, namely a deprivation of a property interest without due process.

Second, the court addressed whether these rights were clearly established at the time of the alleged violation. Although there was no precedent on whether a JIB employee had a property interest in her continued employment, the case law was clear, the court determined, that a property interest could arise from a clearly implied promise of continued employment. The court concluded that "it has long been established that a property right in employment could arise from the practices and promises of the state employer." *Id.* at 10. Because Ms. Crull had come forward with a triable issue of fact regarding whether this type of property interest existed, summary judgment could not be granted for the defendant.

## II

## DISCUSSION

### A. Standards for Qualified Immunity

The defendants appeal the district court's denial of their motion for summary judgment on qualified immunity. This decision is reviewed de novo. *See McGrath v. Gillis*, 44 F.3d 567, 569 (7th Cir. 1995). At this stage, we must view the facts in the light most favorable to Ms. Crull, the nonmoving party. Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Summary judgment should be granted when the facts, viewed in the light most favorable to the nonmoving party, fail to establish an essential element of the nonmoving party's claim on which she will bear the burden of proof at trial. *See Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 742 (7th Cir. 2003).

To establish qualified immunity, a court must first ask whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the [defendants'] conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, the court must determine if the right was clearly established at the time of the violation. *See id.* In addressing these questions, we also must inquire as to whether the facts, viewed in the light most favorable to Ms. Crull, demonstrate a violation of her constitutional rights.[3]

---

[3] Ms. Crull suggests that this court lacks jurisdiction to hear this appeal because it was an interlocutory appeal based on disputed

(continued...)

**B. Violation of a Constitutional Right**

Ms. Crull alleges she was deprived of her property interest in violation of the Due Process Clause of the Fourteenth Amendment when she was fired without notice or a hearing. The burden is on her to demonstrate that she possessed a property interest in her employment with the JIB that is protected by the Constitution. *See Johnson v. City of Fort Wayne*, 91 F.3d 922, 943 (7th Cir. 1996). "A protected property interest in employment can arise from a state statute, regulation, municipal ordinance, or an express or implied contract—those 'rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.' " *Id.* (quoting *Border v. City of Crystal Lake*, 75 F.3d 270, 273 (7th Cir. 1996)); *see Heck v. City of Freeport*, 985 F.2d 305, 310 (7th Cir. 1993) ("[P]roperty interests in the employment context arise in two ways: by an independent source such as state law securing certain benefits, or by a clearly implied promise of continued employment." (internal quotations omitted)). Because Ms. Crull was employed in Illinois, we must examine Illinois law to determine if she had a property interest in her employment with the JIB. *See Johnson*, 91 F.3d at 943.

---

[3] (...continued)

factual issues. We note, however, that "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth,* 472 U.S. 511, 530 (1985). Therefore, we previously have stated that "we have jurisdiction over an appeal when the issue is simply whether, construing the disputed facts in the light most favorable to the plaintiff, the defendant violated any of the plaintiff's clearly established constitutional rights." *Knox v. Smith*, 342 F.3d 651, 656 (7th Cir. 2003).

### 1. State Statute or Regulation[4]

"The presumption in Illinois is that employment is at-will . . . ." *Border*, 75 F.3d at 274. The relevant statute that Ms. Crull offers to rebut this presumption is the Personnel Code. *See* 20 Ill. Comp. Stat. 415/1-25. The Personnel Code establishes "a system of personnel administration under the Governor, based on merit principles and scientific methods." 20 Ill. Comp. Stat. 415/2. Its rules generally provide employees subject to its procedures a hearing prior to termination for cause. *See* 20 Ill. Comp. Stat. 415/8b.16 ("[The rules prepared by CMS shall provide] [f]or hearing before discharge or demotion with the prior approval of the Director of Central Management Services only for cause after appointment is completed, after the person to be discharged or demoted has been presented in writing with the reasons requesting such discharge or demotion."). Neither party disputes that the Personnel Code provides a property interest in continued employment for the employees who fall under its coverage.[5]

As we noted, Ms. Crull must be able to demonstrate that, under Illinois law, a JIB employee has a property interest in her employment. She must establish that the Personnel Code actually applies to her position. Therefore, we now consider whether the Personnel Code applies to JIB employees.

---

[4] The district court did not address whether Ms. Crull had a property interest created by statute or regulation.

[5] *See Powell v. Jones*, 305 N.E.2d 166, 169 (Ill. 1973); *Prato v. Vallas*, 771 N.E.2d 1053, 1064 (Ill. App. Ct. 2002) ("A public employee who may be terminated only for cause has a property interest in his employment within the meaning of the due process guarantees of the United States and Illinois Constitutions.").

### a. applicable constitutional provisions

Article VI of the Constitution of the State of Illinois addresses the Judiciary. Within that article, Section 15 specifically speaks to the retirement and discipline of judges. Subsection "b." creates the JIB. *See* Ill. Const. art. VI, § 15(b). That section then specifies that the Supreme Court shall select two members and the Governor seven; the members shall serve for four-year terms, not to exceed eight years of service. Subsection "c." then addresses the authority and duties of the Board and subsection "d." provides that "[t]he Board shall adopt rules governing its procedures. It shall have subpoena power and authority to appoint and direct its staff." Ill. Const. art. VI, § 15(d).

### b. scope of the Personnel Code

The purpose of the Personnel Code is "to establish for the government of the State of Illinois a system of personnel administration *under the Governor*, based on merit principles and scientific methods." 20 Ill. Comp. Stat. 415/2 (emphasis added). The "Jurisdictions, exemptions" section defines the scope of the Personnel Code by stating that "[a]ll offices and positions of employment in the service of the State of Illinois shall be subject to the provisions of this Act unless exempted in this or any other Act." 20 Ill. Comp. Stat. 415/4. Among the specifically exempted positions are:

(1) All officers elected by the people.

(2) All positions under the Lieutenant Governor, Secretary of State, State Treasurer, State Comptroller, State Board of Education, Clerk of the Supreme Court, and Attorney General.

(3) Judges, and officers and employees of the courts, and notaries public.

(4) All officers and employees of the Illinois General
Assembly, all employees of legislative commissions, all
officers and employees of the Illinois Legislative Reference
Bureau, the Legislative Research Unit, and the Legislative
Printing Unit.

20 Ill. Comp. Stat. 415/4c.

### c. parties' contentions

The defendants focus on the word "under" in Section 2 of
the statute. They contend that Section 2 limits the scope of
the Personnel Code to only those civil service employees
"under the Governor." Correlatively, they assert that the
Personnel Code does not apply to entities outside the
Governor's authority and control. Because the JIB was cre-
ated under Article VI of the state constitution, the section
that concerns the Judiciary, the defendants assert that the JIB
is not "under the Governor" for purposes of the Personnel
Code. The defendants argue that any other reasoning would
bring the Personnel Code statute in conflict with the con-
stitutional grant of authority permitting the Board to ap-
point and direct its staff. The application of the Personnel
Code to the independent JIB would permit, according to the
defendants, the legislative branch to interfere with the JIB's
constitutional authority, contrary to the Illinois Constitu-
tion. *See* Ill. Const. art. II, § 1 ("The legislative, executive and
judicial branches are separate. No branch shall exercise
powers properly belonging to another.").

Ms. Crull, in contrast, asserts that 20 Ill. Comp. Stat. 415/4
applies the Personnel Code to *all* positions in the service of
the State of Illinois except for those positions exempted from
the statute. She submits that JIB employees are not exempt.
Specifically, she notes that many of the exempt organiza-
tions in Section 4 are not properly considered "under" the
Governor's jurisdiction.

### d. application

When the Personnel Code is read as a whole, it does not unambiguously state whether it applies to the JIB. Section 4, describing the "jurisdictions" and "exemptions" of the chapter, states that the code applies to *all* positions "in the service of the State of Illinois" unless exempted, 20 Ill. Comp. Stat. 415/4; however, Section 2, discussing the purpose of the chapter, states that the Personnel Code is to establish "a system of personnel administration *under the Governor*." 20 Ill. Comp. Stat. 415/2 (emphasis added). The JIB clearly is one of the "offices and positions of employment in the service of the State of Illinois," but it is difficult to see how it is an agency "under the Governor."

We think a textual analysis of these provisions provides a fairly secure basis for determining, as various organs of Illinois government discussed earlier in the opinion have, that the Board is not subject to the Personnel Code. Nevertheless, for the sake of argument, we shall assume that these texts leave some doubt and look beyond the text to verify the intent of those provisions. At the outset, we note that Illinois courts grant "considerable deference to an agency's interpretation of a statute it administers"; however, "an agency's interpretation is not binding as to questions of law and will be rejected if erroneous*." See Denton v. Civil Serv. Comm'n*, 679 N.E.2d 1234, 1236 (Ill. 1997). The CMS is the agency in charge of administering the Personnel Code, and, therefore, we give their interpretation appropriate deference.

The CMS, in a letter responding to the Board's questions whether the Personnel Code applied, stated that JIB "employees have been considered exempt from the Personnel Code since the 1970 Constitution became effective." R.41, Ex.4, Letter of Oct. 19, 1992, at 1. The Chief Legal Counsel for CMS further opined that "[w]hen the Constitution be-

came effective, its grant of authority to the Board to appoint its employees [Section 15(d)] was contrary to and inconsistent with the provisions of the Personnel Code." *Id.* The CMS concluded that this constitutional grant of authority "was an expression of intent that employees of the Board are exempt from the Personnel Code." *Id.* The CMS also took note of the impact that the Personnel Code would have on other branches of government because it requires that most employees only be fired for cause. In light of this restriction, the CMS reasoned, the Personnel Code would impose "more than a peripheral, indirect, or collateral change in personnel administration." *Id.* at 2. The CMS concluded that employees of the JIB "are exempt from the provisions of the Personnel Code." *Id.* at 3.[6]

We see no reason to dispute this interpretation of the statute. The CMS's interpretation is well grounded and firmly supported by traditional principles of statutory construction. When the creation of the JIB is viewed in context with the Personnel Code as a whole, it is clear that those procedures were not intended to be applied against the JIB.

---

[6] This interpretation is consistent with the Attorney General's comments in response to the JIB's inquiry whether the Personnel Code applied to its employees. *See* R.41, Ex.4. It also is consonant with the more recent letter from the Chief Labor Relations Counsel for CMS, Nancy Pittman, responding to Ms. Crull. Ms. Pittman informed Ms. Crull in August of 1999 that she could not answer Ms. Crull's questions because the JIB was not "under the jurisdiction of the Governor." R.41, Ex.9. This interpretation also conforms with JIB's statements to its employees. For example, in adopting a vacation policy based on the Personnel Code, the Board expressly noted that "the Board is not governed by the Personnel Code" but adopted the policy because it was in the best interest of the public to do so. R.41, Ex.6.

Structural principles of constitutional and statutory inter-
pretation support this conclusion. The JIB was created in the
1970 Illinois Constitution; the Personnel Code has been in
existence since 1955. Obviously, the Personnel Code did not
specifically address the JIB at the time of its enactment; the
JIB did not exist. The Personnel Code, however, exempts all
elected officers, "all Judges, and officers, and employees of
the courts, and notaries public," and all employees of the
Illinois General Assembly, including employees of legi-
slative commissions. 20 Ill. Comp. Stat. 415/4c. In sum,
Section 4c exempts nearly all legislative and judicial posi-
tions, leaving only those positions in the executive branch
subject to the Personnel Code.

Historical factors support this structural view. Prior to the
1970 creation of the JIB, its functions were exercised by the
Illinois Supreme Court. *See Owen v. Mann*, 475 N.E.2d 886,
890 (Ill. 1985). The JIB's predecessor, the Illinois Courts
Commission, was therefore exempt from the Personnel Code
because it was under the auspices of the Supreme Court.
Although JIB employees may not be considered judges or
employees of the courts—those employees specifically listed
in Section 4c(3)—the JIB was created as part of Article VI
which addresses the Judiciary, and it seems equally likely
that the Personnel Code was not intended to apply to them.
The Board also was given explicit power to "appoint and
direct its staff." *Id.* § 15(d). The placement of the JIB in the
Judiciary Article with this express grant of authority pro-
vides a very substantial reason to question the Personnel
Code's application to the JIB. *See* Ill. Const. art. II, § 1 ("The
legislative, executive and judicial branches are separate. No
branch shall exercise powers properly belonging to another.").
In accord with this express power to appoint and direct its
staff and establish rules governing its procedures, the only
significant role another branch has over the personnel oper-
ations of the Board is that the Governor is permitted to

appoint seven members while the Illinois Supreme Court selects two. Applying the Personnel Code's restrictions to such an entity would impinge on the express grant of power. Because the JIB did not exist when the Personnel Code exemptions were enacted, because its predecessor was exempt and because Section 4c generally exempts positions in the legislative and judicial branches, it is reasonable to conclude that Section 2 of the Personnel Code applies only to those positions "under" the Governor, which excludes the JIB from its reach.

Moreover, the CMS interpretation is consistent with the practices and interpretations over the entire 30-year life of the agency. It is consistent with Governor Ogilvie's comments at the JIB's initial meeting in 1971, that the JIB was an independent agency beyond his authority. *See* R.41, Ex.2 at 2. It is also supported by the JIB's practice of not hiring employees through the CMS system and setting their own procedures regarding personnel.

Accordingly, we conclude that the Personnel Code does not apply to JIB employees. Therefore, Ms. Crull does not have a property interest arising from the Personnel Code. This conclusion, however, does not end our inquiry, and we must now turn to consider other potential sources of property interests.

### 2. Clearly Implied Promise of Continued Employment

Although Ms. Crull did not have a property right arising from an explicit contractual agreement or the Personnel Code, property rights are not created solely by these sources. " '[P]roperty' interests subject to procedural due process protection are not limited by a few rigid, technical forms. Rather, 'property' denotes a broad range of interests that are secured by 'existing rules or understandings.' " *Perry v. Sindermann*, 408 U.S. 593, 601 (1972) (internal citations omit-

ted). Ms. Crull may establish a property interest in her employment if she can demonstrate the existence of an unwritten "common law of employment" providing a right to be terminated only for cause. *Id.* "A common law of employment is established through rules or 'mutually explicit understandings' and not solely through past practices of the employer." *Hermes v. Hein*, 742 F.2d 350, 355 (7th Cir. 1984) (internal citations omitted); *see Perry*, 408 U.S. at 601; *Miller v. Crystal Lake Park Dist.*, 47 F.3d 865, 867 (7th Cir. 1995) (noting that a " 'mutually binding obligation' is just fancy language for 'contract' "); *Powell*, 305 N.E.2d at 169 (noting that "every public employee does not have a right to continued employment," but "a public employee can have such a right dependent upon the surrounding circumstances including existing rules and understandings").

When basing a property interest on mutually explicit understandings, however, extreme care must be taken in evaluating the nature, quality and clarity of the purported understandings. Not anyone can bind the government. It is "firmly established that the 'mutually explicit understandings' that constitute property interests under the holding of *Perry* cannot be based on the representations of government officials who are not authorized to make such representations." *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1334 (7th Cir. 1989).[7] We must be mindful of this restriction when considering the facts that may demonstrate a mutually explicit understanding.

---

[7] *See Fittshur v. Vill. of Menomonee Falls*, 31 F.3d 1401, 1408 (7th Cir. 1994); *Santella v. City of Chicago*, 936 F.2d 328, 331-32 (7th Cir. 1991); *Wolf v. Larson*, 897 F.2d 1409, 1413 (7th Cir. 1990); *Smith v. Bd. of Educ. of the City of Chicago*, 853 F.2d 517, 521 (7th Cir. 1988); *Common v. Williams*, 859 F.2d 467, 472 (7th Cir. 1988); *Hadley v. County of Du Page*, 715 F.2d 1238, 1242-43 (7th Cir. 1983).

### a. executive director

Ms. Crull primarily relies upon a statement by Executive Director Tohinaka at the time Ms. Crull was hired to establish her property interest. Ms. Crull submitted affidavit testimony that Tohinaka told her that there was a six-month probationary period after which "they have to have a reason to fire you." R.44, Ex.3 at 21. According to Ms. Crull, this led her to believe that she would be subject to progressive discipline and that she would be given a hearing prior to termination. Ms. Crull, however, does not offer any indication that the Executive Director had the actual authority to establish her employment conditions.

Ms. Crull admits that she "did not present any facts or exhibits regarding the Executive director's authority, and the district court did not consider the issue." Appellee's Supp. Br. at 1; *see* Appellee's Br. at 14. Ms. Crull explains that she did not proffer such evidence because the defendants "never made assertions regarding the authority of the JIB Executive Director in their statement of material Facts (Doc. 41)." Appellee's Supp. Br. at 1. Ms. Crull acknowledges, however, that the defendant offered deposition testimony and an affidavit regarding the power of the Executive Director. *See* Appellants' Br. at 14 n.4. The Executive Director has no authority, according to the defendants, to establish agency policy or make employee decisions without the approval of the Board. Specifically, Executive Director Twine averred that in her position as Executive Director she did not have the power to fire anyone. *See* R.44, Ex.6 at 13. The defendants submitted evidence that the Board, and not the Executive Director, determines whether to promote an employee, *see* R.41, Ex.14, to give an employee a raise, *see* R.44, Ex.6 at 14-16, and to adopt other personnel policies for the JIB, *see* R.44, Ex.19 at 2. When the Board hires employees, the Board sets the salary and does not offer employment

contracts for any time frame. *See* R.41, Ex.19 ¶ 4. The Board considers investigators at-will employees, and it has no policy that employees can be fired only for cause. *See id.*

Ms. Crull had to support her assertion of mutually explicit understanding of continued employment by offering statements from someone who could bind the Board. *See Wolf*, 870 F.2d at 1334; *see also* n.9 *infra*. Ms. Crull had the burden, not only to demonstrate a property interest, *see, e.g., Lawshe v. Simpson*, 16 F.3d 1475, 1483 (7th Cir. 1994), but to demonstrate that the person making statements had the authority to create a property interest, *see Schoenberger v. Chicago Transit Auth.*, 405 N.E.2d 1076, 1136 (Ill. App. Ct. 1982) ("The authority to bind a principal will not be presumed, but rather, the person alleging the authority must prove its source . . . ."); *see also Yugoslav-American Cultural Ctr. v. Parkway Bank & Trust Co.*, 682 N.E.2d. 401, 406 (Ill. App. Ct. 1997) (noting that the burden on the person seeking to bind the principal "is difficult to meet because, where the existence of an agency is an issue, the mere statements of the alleged agent, made outside the presence of the principal and not subsequently approved by him, do not establish the existence of the principal-agent relationship"). Ms. Crull did not produce the facts to support her claim.

Ms. Crull also submits that there are facts in the record that suggest the Executive Director had the *apparent* authority to change her employment terms. It is well established that, generally speaking, "[a] principal is bound equally by the authority that he actually gives his agent and by that he appears to give." *Amcore Bank v. Hahnaman-Albrecht, Inc.*, 759 N.E.2d 174, 183 (Ill. App. Ct. 2001). However, this general rule must be applied with great circumspection when a state entity is the principal.

The JIB is a creature of the Illinois Constitution. It is composed of members that are appointed for limited terms. The Constitution specifically provides the Board with the

authority to appoint and direct its staff. This is an unlikely situation in which to apply the common law principles of apparent authority, which would effectively permit the statements of one Executive Director, an employee of the Board, to bind all subsequent Boards and thus to restrict the Board's specific constitutional grant of authority. *See Heck v. City of Freeport*, 985 F.2d 305, 311 (7th Cir. 1993) (noting that property interests arising from mutually explicit understandings only could occur "if consistent with official law"). Indeed, Illinois courts have held that "it is contrary to the effective administration of a political subdivision to allow elected officials to tie the hands of their successors with respect to decisions regarding the welfare or the subdivision." *Cannizzo v. Berwyn Township*, 741 N.E.2d 1067, 1071 (Ill. App. Ct. 2000) (citing the rule established in *Millikin v. County of Edgar*, 32 N.E. 493 (1892)).

Applying the rule to municipalities, the court in *Cannizzo* held that an elected board did not have authority to employ persons in positions that were important to the effective administration of the board beyond its term. *See id.; see also Grassini v. DuPage Township*, 665 N.E.2d 860 (Ill. App. Ct. 1996). Because the board in *Cannizzo* used staggered appointments, the length of time used to measure or limit the board's power was the term of the elected official appointing the board. The court determined that a three-year employment contract extended beyond the board's authority and was void *ab initio*. *See Cannizzo*, 741 N.E.2d at 1074.

Furthermore, in circumstances outside the context of hiring employees, the use of apparent authority by government employees to bind the State has been circumscribed considerably in Illinois. A party who deals with a governmental body assumes the risk of ascertaining whether the agent is

acting within the bounds of the agent's authority or whether the agent is outside his authority.[8]

Even if apparent authority applied in the present situation, Ms. Cole has not come forward with facts to establish the apparent authority of the JIB Executive Director to guarantee that employees would be terminated only "for cause,"

---

[8] *See Rubidoux v. Northeastern Illinois Univ.*, 51 Ill. Ct. Cl. 275, 1998 WL 1758261, at *9 (1998) (noting that the doctrine of apparent authority "has limited, if any, application to the State, where contractors are required to ascertain at their peril the true authority of purported agents of the State"); *see also County of Cook v. Patka*, 405 N.E.2d 1376, 1380-81 (Ill. App. Ct. 1980) ("Anyone dealing with a governmental body takes the risk of accurately ascertaining that he who purports to act for that body stays within the bounds of his authority and this is so even though the agent himself may have been unaware of the limitations on his authority."); *Ernat v. State of Illinois*, 36 Ill. Ct. Cl. 82, 90 (1984) (stating that "[t]he State cannot be bound by agents with apparent authority rather than actual authority in most situations because such a policy could be disastrous to the State's budget"); *cf. Gersch v. Dep't of Prof'l Regulation*, 720 N.E.2d 672, 681 (Ill. App. Ct. 1999) ("A public entity cannot be estopped by an act of its agent which is beyond the authority expressly conferred upon that official."); *Hamwi v. Zollar*, 702 N.E.2d 593, 598 (Ill. App. Ct. 1998) ("A municipality cannot be estopped by an act of its agent beyond the authority expressly conferred upon that official."); *Akmakjian v. Dep't of Prof'l Regulation*, 679 N.E.2d 783, 787 (Ill. App. Ct. 1997) (refusing to permit representations beyond the agent's actual authority to estop a governmental body). *But cf. Genie Constr. Co. v. Illinois*, 51 Ill. Ct. Cl. 153, 1999 WL 33246466, at *9 (1999) ("Where the State vests a person with apparent authority to order services, the Claimant reasonably relied upon his apparent authority to bind the State, and the Claimant performed the services, the State cannot deny that the person had actual authority to bind the State." (internal citations omitted)).

would be subject to progressive discipline and would be terminated only after a hearing. "[A]pparent authority arises when a *principal*, through words or conduct, creates a reasonable impression that the agent has the authority to perform a certain act." *Amcore Bank*, 759 N.E.2d at 183-84 (internal citations omitted). Apparent authority must be traced to some word or act of the principal, here the Board, that creates a reasonable impression that the agent, the Executive Director, has the authority to act with respect to the matter at issue, here the nature of the employment relationship.

In support of her claim of apparent authority, Ms. Crull asserts that the Executive Director has been permitted to "establish[ ] employment policies without the approval of the Board, including the 'policy for daily operations' and rules on personal and sick days. (Doc. 41, Ex. 7, Ex. 9A)." Appellee's Br. at 15. However, the authority cited for this proposition does not support Ms. Crull's assertion. Exhibit 7 is a cover memo from the Executive Director informing JIB employees of changes in the "Policy for Daily Operations." Nothing in the cover memo or in the policy itself suggests that the policy was adopted without Board approval; to the contrary, in fact, with respect to "Vacation and Personal Days," the policy states that "[a]lthough JIB is not covered by the State Personnel Code, *the Board has adopted* the accumulated vacation leave policy applicable to all State employees." R.41, Ex.7 at 2 (emphasis added). Similarly, Exhibit 9A simply is an explanation of how the sick-time policy will be administered, i.e., hourly increments in which employees may use sick time; it does not suggest that the Executive Director has the authority to make unilateral policies with respect to terms and conditions of employment, for instance, the actual number of sick days to which an employee is entitled. Furthermore, with respect to the only other termination of employment that took place prior to Ms. Crull's, it was the Board that made the termination

decision (notably without a hearing). Finally, in announcing its decision to terminate Jennings, the Board expressly stated in its decision that it was authorizing the Executive Director to "determine a suitable effective date which gives him at least two weeks notice." R.41, Ex.14. Far from giving the impression that the Executive Director has the authority to set terms of employment, these actions lead to the conclusion that the authority rests strictly with the Board.[9]

Having determined that the Executive Director did not have apparent authority to offer employment with specific requirements for discharge, we turn to the question of whether the Board itself created any property interest in the employees' continued employment.

### b. Board

The practices of the Board also do not support a mutually explicit understanding to continued employment. Ms. Crull has not offered any evidence that the Board shared her understanding of her employment terms. The evidence submitted only leads to an inference that Ms. Crull had a misunderstanding as to her entitlements. *See Wolf*, 870 F.2d at 1335. There is nothing to infer that the Board reached an agreement with her or intended her to have any form of

---

[9] Although not addressed by the parties, we note that, in support of her apparent authority argument, Ms. Crull points primarily to actions of the Executive Director and the Board taken *after* she accepted her employment with the Board. It is difficult, therefore, for Ms. Crull to argue that she relied on the impressions resulting from these later actions when she accepted her earlier-in-time offer of employment (and, presumably, relied on the Executive Director's statements regarding the nature of her employment with the Board).

tenure.

Ms. Crull asserts that no JIB investigator had been terminated without cause and without an opportunity to improve their performance. She also asserts that the JIB had a practice of placing employees on probation prior to terminating them. Ms. Crull points to evidence in the record demonstrating that the Board voted to remove Executive Director Twine from probation over six months after she became the executive director. *See* R.41, Defendant's Statement of Uncontested Facts ¶ 3 (noting that Twine became the Executive Director in January 1998); R.44, Ex.19 at 2 (Board minutes of October 9, 1998, removing Ms. Twine from probation). Ms. Crull also points to defendants' statement that "[t]he JIB, through interim Director Sandra Otaka, also extended McClory's probation during the transition between Executive Directors after Tohinaka's death so that the new director 'could fire [him] more easily.' " Appellants' Br. at 16. Finally, she points out that the Board has adopted some Personnel Code policies.[10]

Past practices of an employer are not sufficient, standing alone, to establish a mutual understanding. *See Lawshe*, 16

---

[10] The fact that the JIB adopted some provisions of the Personnel Code does not create a genuine issue of material fact regarding the nature of Ms. Crull's employment. When the Board adopted one provision of the Personnel Code, it explicitly stated it was not required to adopt it but did so because it was in the best interest of the public. If Ms. Crull assumed that the Board would adopt all of the Personnel Code based on its adoption of a few policies, this is evidence of a mistake rather than any mutual understanding. "A misunderstanding of one's entitlements, even if reasonable, does not enlarge those entitlements." *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1335 (7th Cir. 1989) (internal quotation marks and citations omitted).

F.3d at 1480; *see also Hermes*, 742 F.2d at 355 ("[A] common law of employment is established through rules or mutually explicit understandings and not solely through the past practices of an employer." (internal citations omitted)). The past terminations, however, do not indicate a "common practice." The record reveals evidence of only one other employee fired besides Ms. Crull. In effecting this termination, it is not even evident that the Board permitted him an opportunity to respond to its decision.[11]

The evidence in the record regarding the Board's understanding is that it considered JIB employees to be employed at will. Board member Parkhurst stated in a deposition that she considered Ms. Crull an at-will employee. *See* R.41, Ex.23, Parkhurst Dep. Significantly, in June of 2000, Board Chairman Sunderman told Ms. Crull she was an at-will employee. R.41, Ex.15 ¶ 5. Six months prior to terminating Ms. Crull, the Board asked outside counsel for an opinion explaining the status of its employees, specifically whether they were at-will employees. The outside counsel informed

---

[11] The Board fired Tom Jennings after considering the reviews provided by the Executive Director and Jennings' written response to the Executive Director's criticism. At their March 14, 1997 meeting, the Board noted:

> With respect to annual personnel reviews the Board reviewed Director Tohinaka's packet of materials consisting of reviews and attachments on all staff, including Tom Jennings' March 5, 1997 memo in response to his February 24, 1997 Annual Performance Review. As a result of their discussion, the Board voted to terminate Tom's employment with authorization granted to Director Tohinaka to determine a suitable effective date which gives him at least two weeks notice.

R.41, Ex.14 at 2.

the Board that the employees were at-will employees. *See* R.44, Ex.15 at 53-56. There is no indication that the Board ever came to a mutually explicit understanding with Ms. Crull to provide her with a right to only be fired for cause. Because it is the plaintiff's burden to show mutually explicit understanding or common law of workplace that establishes a property interest, and because, viewing the facts in the light most favorable to Ms. Crull, she has not met this burden, we must conclude Ms. Crull did not have a property interest in her continued employment.[12]

## Conclusion

We find that Ms. Crull failed to demonstrate a property interest in her continued employment pursuant to any statute, regulation or contractual agreement, either express or from mutually explicit understandings. Accordingly, the defendants were entitled to summary judgment. The judgment of the district court is reversed.

REVERSED

---

[12] It is not necessary, therefore, for us to consider the second prong of the qualified immunity analysis—whether the right that was denied was clearly established at the time the defendants acted.

A true Copy:

Teste:

_____

*Clerk of the United States Court of
Appeals for the Seventh Circuit*